LILLIE MAE JOHNSON, RESPONDENT, v. PHILIP SMOLINSKY ET AL., APPELLANTS.—81 S. W. (2d) 434.

Kansas City Court of Appeals. February 18, 1935.

*Allan R. Browne, W. B. Ennis* and *Grover & Browne* for respondent.

*Maloney, Schwimmer & Bredehoft* and *Joe E. Burris* for appellants.

TRIMBLE, J.—Defendants are partners doing business in Kansas City, Missouri, as druggists under the name of the Parkview Pharmacy. They are herein sued by plaintiff for damages growing out of their alleged negligence in the filling and preparation of a medical prescription given for and taken by plaintiff while a patient and in bed from her first childbirth. Plaintiff recovered a verdict for $2750 and from a judgment thereon defendants have appealed.

The case was tried upon the first amended petition which, after alleging defendants' business and the name under which they operated, states that on the 18th day of January, 1932, plaintiff, through her husband, obtained a prescription filled by defendants at said Parkview Pharmacy, through their agents and servants, "for one dram of ergot, all of which, under the physician's instructions, was to be taken immediately upon filling of the prescription;" that defendants made up an ounce of said medicine "in violation of said prescription and negligently placed directions on the bottle that one and one-half teaspoonsful should be taken and negligently failed to label the contents 'poison;' that she took as much as she could swallow, and enough of said quantity, negligently provided by defendants, as to poison her and she became violently ill as a direct result thereof and as a result of taking this quantity which was so large an amount as to be poisonous, and a larger amount than was named in the prescription by her doctor."

The first amended petition further alleged that the negligent acts and omissions of defendants, as above set forth, operated severally and concurrently as the sole proximate cause of plaintiff's injuries as follows:

"She suffered an over-contraction of the uterus and each of her internal organs, she became violently sick and was permanently weakened; each of her female organs and organs of reproduction was strained and contracted and weakened and the functions thereof impaired, and she has subsequently suffered a miscarriage. She was caused to suffer great physical pain and mental anguish, to

suffer headaches, sickness, nausea, dizziness, loss of weight, strength and sleep, loss of the ability to work and labor and earn her livelihood. Each of the above injuries is permanent in its nature and character all to her damage in the sum of $7500." Wherefore plaintiff prayed judgment, etc.

The answer to the first amended petition denied each and every allegation therein contained and then set up a plea of contributory negligence in that plaintiff (1) carelessly failed to follow the directions and instructions of her physician in the taking of said ergot, and (2) negligently failed to read the directions on the bottle before taking any of said ergot, and (3) negligently took a greater quantity of said ergot than specified by the directions on said bottle. The record, however, seems to show that the *second* ground of the above mentioned plea of contributory negligence was voluntarily stricken out or erased from their said answer.

The evidence in plaintiff's behalf amply tends to show:

That plaintiff, after being married for four years, had one child, "a fine baby boy," born on January 18, 1932, at the home of her mother in Kansas City, Missouri. Her husband received word of the birth of said child about seven o'clock A. M. When he got home his wife was, of course, in bed. She was, however, able to talk and was "just as jolly as she could be." The doctor wrote a prescription for one dram fluid extract of ergot with directions thereon to "take at once," and gave it to the husband and told him to have it filled. He immediately took it to defendants' drug store, known as the Parkview Pharmacy, where he had traded before, and was told by the clerk in charge to leave the prescription and "come back later." He did so, and upon returning he was given a one-ounce bottle containing an ounce of the medicine called for. The husband knew nothing of the medicine or of its nature. He took it home, it having a paper label pasted on it, the top edge of said label coming up to the "shoulder" of the bottle, i. e., where the sides of the bottle left their perpendicular direction and began sloping to the small neck of the bottle. The contents of the bottle filled it up above the top edge of the label. In addition to the printing on the label, containing the name Parkview Pharmacy, its location and telephone numbers, blank spaces for the number of the prescription and the name of the doctor who prescribed it (thus, No. ——, Dr. ————), the label contained written thereon its number, 10,365, on the space provided therefor, the doctor's name "Radford" and the directions and date thus, "One ½ teaspoonful at nite" and below that the date "1-18-32," all in handwriting of the one who had prepared the bottle and filled the prescription. The original exhibits in the case were produced, by agreement, at the argument of this case in the appellate court, and photographs of the prescription, and bottle are in the record. When the bottle was introduced at the trial it

was a little less than half full and it was testified that the remainder of the contents still in the bottle was what was left therein at the time the attempt to give the patient all of the medicine was frustrated by her convulsive actions as hereinafter related. The spoon with which the medicine was attempted to be given was also introduced in evidence and while plaintiff and her attendants did not know what size it was, but thought it was a teaspoon, it seems to be a dessert spoon.

It was shown in evidence that when plaintiff was being given the third spoonful, her head turned over, she threw up her hands and the spoon and its contents were knocked "all over the sheet." "She began to draw up and we rubbed her down like that." . . . "She appeared (like) she didn't know anything." This was about four-thirty or five o'clock in the afternoon, and she remained in that "stiffened up, cramped condition" about an hour and twenty minutes. The doctor came and stayed with her about three or four hours. A hard lump formed in the lower part of her stomach. She never "came to" until sometime the next day; the lump stayed there something over a week, but finally went down.

The prescription was introduced in evidence and, aside from the name, business address and residence of the doctor, printed on it, and the name and address of the person for whom it was given, written in the handwriting of the doctor issuing it, it had written on it the following: "F. E. ergot Z Sig Take at once." "1-18-32," signed by the doctor.

The doctor, a witness who testified for plaintiff, testified that he had given her "prenatal care for about six months before the baby was born; the birth was normal in every respect." After the birth "normally, she was doing fine." He prescribed for her the prescription in question and he interpreted the writing on the prescription to mean "F. E. fluid extract of ergot, one dram, take at once." A dram is usually about a teaspoonful approximately, and in an ounce bottle (the size of the bottle used), are eight drams, so that in the bottle, if it were full, there would be eight doses. The doctor testified that "ergot is a control that is given after childbirth to control possibly too much hemorrhage and promote contraction of the organ of gestation." It is known as a hemostatic to control or check bleeding. "It is a drug to check bleeding as much as possible, and to cause contraction of the uterus too, internally. The uterus is distended in childbirth, because of the size of the child, internally, and after childbirth it must recede to its normal size. Ergot helps to recede to its normal size and condition also."

A dram is the normal dose which is about a teaspoonful.

The drug is a poison. More than a teaspoonful, to a woman in the condition of plaintiff, is an overdose and would have a poisonous effect. The effect of such a dose "in a case of this kind would

cause the patient to become very, very painful; headache, nausea, possibly vomiting, accelerated pulse; difficulty in breathing; contractions of the abdomen by means of the uterus itself; and finally convulsions. Convulsion, you might call, would be a spell of contraction of the extensors or any group of muscles of the body, principally the limbs and the arms; sometimes of the trunk, particularly of the stomach or abdomen.'' That afternoon or evening he was called back and found her in the condition he had just stated ''as to the symptoms of the poisonous effect of the drug, namely, cramping of the stomach, of the limbs, of the arms, and nausea, vomiting, with headache and rise of blood pressure. The abdomen was very tonic in spasms; contraction of the muscles of the stomach were very rigid, the uterus was very hard and possibly placed in one position.'' This could be seen through the abdomen wall. The doctor began to treat her so as to eliminate the drug as quickly as possible and to relieve her pain as much as possible. He treated her for possibly three weeks and then the condition of her abdomen began to go down, the blood pressure to recede, the spasms of the stomach and the uterus began to subside, she began to breathe better and she gradually became normal. The doctor, however, treated her at intervals for two years after that. Following what the doctor called a normal condition, the doctor testified that ''another condition arose that was an aftermath of the administration of the overdose of the ergot. This produced a very specific inflammation of the internal female organs and the condition is still prevalent. The condition of the patient has begun to recede from the normal and the patient is now in a diseased condition following the administration of the drug. She has, as a direct result of an overdose of the poisonous effect of ergot, an inflammation of the female organs. I examined her last, on November 1st of this year (1933). The inflammation could result in a miscarriage. The inflammation that I found is coming from the inside of the uterus due to the fact that when the contraction from the poisonous effect of the drug had exerted its power upon the uterus, the normal amount of discharges that were due to come from that organ practically were closed and the canal itself remained closed until it was opened by elimination. That produced inflammatory processes that are prevalent. . . . My judgment about this patient's future is a little uncertain as to her health. Her health has not been the same, the inflammation has begun to take charge of her system. She has had two miscarriages. She has been unable to hold them. I can't say whether she will be able to carry any children in the future, because she is not normal under the circumstances so far. If she continues in the present condition, I am hardly thinking it would be probable she could carry the child to term.'' An inflammation of the private parts is always painful. ''I did not permit her to nurse the child because the poison effect of the drug in the body might

cause a poisonous effect to the milk itself and I took no chances. The child was put on a bottle.''

Ruby Foster, a sister of plaintiff, testified to being called up to plaintiff's room by her mother to help rub her, she was ''awfully sick.'' She saw the lump, about the size of her two fists, that came in her abdomen. Before the child was born, plaintiff got around all right. Now, she doesn't get around at all. Her sister, Roberta Biggins, has to look after her. Witness didn't see the medicine given plaintiff.

Roberta Biggins testified she was not present when the medicine was given plaintiff. Before the birth of the child she appeared to be a strong healthy girl. She does not get around well. She can't fire the furnace. She does not do the work she did before the birth of the child.

Dr. Feist, a graduate of the Missouri University with a Medical Degree from Washington University, and served as an interne for a year at St. Joseph Hospital, duly licensed to practice medicine, and on the staffs of St. Joseph, Research, General, Trinity, Lutheran and Menorah Hospitals, testified:

That the therapeutic dose of fluid extract of ergot is one teaspoonful. A teaspoonful and a dram are the same. The primary effect to be desired when ergot is given in a therapeutic dose is to produce a contraction of the uterus, to stop hemorrhage of the uterus. An overdose of ergot is harmful; the uterus is all muscles, and the contraction thereof causes it to become just as hard as one's leg when it cramps, and just as painful except that the pain lasts much longer. An overdose of said fluid extract of ergot can produce a miscarriage.

Plaintiff's mother, Pladdie Foster, testified that the birth occurred about two-forty-five in the morning and the ergot was given about four-thirty in the afternoon. They commenced giving plaintiff the medicine with a spoon. She took two spoonfuls and her mother tried to give her a third spoonful. She took perhaps a sip of it and then fell back on the pillow knocking the spoon, and the liquid remaining in the spoon, out of the mother's hand. Witness could not read the prescription. She could read English, but ''I couldn't read that.'' At the time witness put the third spoonful to plaintiff's mouth, she had a spasm. She ''just fell back and doubled up.'' She testified to the knot in her daughter's stomach and the symptoms she had as hereinabove shown.

Plaintiff testified in the birth she got along ''just fine.'' She took no anaesthetic of any kind. The last month before the baby was born, her sister, Roberta Biggins did her work for her. The baby was born in the morning of January 18, 1932, at three-forty-five. Some medicine was brought in the afternoon. She didn't know what the medicine was. When she was given the medicine she was ''laying

there laughing and talking with my mother, telling them how I felt and was naturally happy over the baby. . . . As far as I know I remember taking two spoonfuls but the third I don't remember whether I taken it all." That was the last she remembered until the next morning at eight o'clock, she "began to remember and could recognize things." She had terrible pains in the lower part of her abdomen and had a "terrible knot" in her stomach which she did not have before she took the medicine. The doctor took the baby from her nursing but finally allowed her to suckle him about the middle of March. About April of 1933, she had a miscarriage which was not intentional. She, at the time of the trial (November 21, 1933), still has pain in the lower part of her abdomen. She is very weak. She weighs 117 pounds but before she became pregnant she weighed 135. She didn't know anything about the medicine she took.

She testified to two miscarriages and as to having marital relations with her husband, formerly "about three times times a week" but later "not as often" because she "was unable to stand it."

One of the defendants, testifying in their behalf, said that on the morning of January 18, 1932, about nine-thirty, he saw the prescription for ergot back of the prescription counter in defendants' store. It was not filled. He talked with the pharmacist in charge, Dave Magady, about it.

"I looked at the prescription and I read it and it said 'Fluid Extract of Ergot, Drams 1.' And I couldn't read the directions. I had a talk with the doctor over the telephone. I called him personally. I asked for Dr. Radford. I think he answered the telephone. He said he was Dr. Radford. I talked to him about this prescription. This conversation had with Dr. Radford was in relation to the filling of this prescription (plaintiff's exhibit No. 3). As I remember it, I called one number on the prescription and I couldn't get hold of the doctor and called another number and finally got in touch with the doctor and I told him it was the Parkview talking and I had three prescriptions and had filled two of them, but there was one I couldn't make out the directions and the amount, so he asked me to read it over to him so I read it 'Fluid Extract of Ergot, Drams 1.' I said, 'Doctor, you don't want a prescription for one dram of fluid extract,' because I had never seen a prescription like that in my life. I said, 'You want an ounce, don't you?' and he said, 'Yes, fill an ounce.' So I said, 'How do you want it taken?' He said, 'Taken one-half teaspoon at night and if I want the patient to have any more, I will be there tonight.' He said, 'I have got to see her.' So I wrote the prescription and when Mr. Magady was there, the druggist, I called him back and told him—(witness here shown defendants' exhibit No. 5). That is my handwriting. I wrote it at the time I talked to the doctor. I talked with him about

the directions. That was the main reason why I called him because I couldn't read the directions at all. I did not fill this prescription myself. I took that prescription and made the copy of it and left it in on the prescription counter and told the pharmacist in charge to fill them and send them out."

The prescription for ergot written out by witness, after talking over the telephone to Dr. Radford, was introduced in evidence as defendants' Exhibit 5, and, as near as it can be shown in print, is as follows:

> "Parkview Pharmacy No. 5
> "Deep Cut Prices
> "xxx & Prospect   Phones Benton 2207-9503-9504
> "Kansas City, Missouri.

"R   Mrs. Johnson                            Date 1-18-32
> "Address   2308 Lydia
> "F. E. Ergot (Hieroglyphic symbolizing 1 ounce)
> "One (½) teaspoonful at night
> "10365
> "1-18-32
> "69
>
> "Radford                 M. D."

"As per
   conversation
     with
      Doctor
        S."

The statement that Dr. Radford was talked to over the phone and authorized any change in the prescription he had written was flatly denied by him. And it was for the jury to decide whom they would believe.

Respondent, because of alleged omissions, etc., in appellants' abstract, filed a respondent's additional or supplemental abstract, from which it appears that at the trial defendants introduced in evidence plaintiff's *original* petition which stated among other things that "all of the ergot was to be taken immediately." Said additional or supplemental abstract shows that there was evidence to the effect:

That the prescription shows that it was to be "taken at once."

That plaintiff's husband thought plaintiff was to be given, and he intended to give her "all that was in the bottle;" that the plaintiff's mother, when she started to give her the medicine out of the bottle "intended to give her the full bottle because the doctor had left her such word and she was going by the doctor's orders;" that ergot is a dangerous poison if not used with great restrictions; that an overdose of ergot could cause convulsions and unconsciousness from

the poisoning or from the hysteria, and would close up the little blood vessels leading from and to the uterus and would prevent the blood from taking away what is in the uterus and would cause a discharge through the mouth of the uterus; that the pharmacist who wrote the directions on the bottle, witness Magady, could not himself tell what the directions he had written meant.

Respondent has filed motion to affirm judgment on the ground that appellants have wholly failed to comply with our Rule 16 as to the statement required by Section 1060, Revised Statutes of Missouri, 1929, to be filed by an appellant. Under said section and our Rule 16, the statement "should consist of a clear and concise statement of the case without argument, reference to issues of law or repetition of testimony of witnesses." We have examined appellants' statement and find that it sufficiently complies with the rule so as to leave us wholly without warrant to dismiss the appeal or affirm the judgment for lack of a statement. The same is true as to the alleged insufficiency of the appellants' "assignments of error" and "points and authorities." While one or more of them may not be sufficiently specific and definite to call for a ruling thereon, yet many of them are specific enough to require a ruling on them. Hence the respondent's motion to affirm is overruled.

Likewise, we find that five assignments or points of alleged error presented so as to properly call for our ruling are in fact contained and raised in the motion for new trial, so that their consideration cannot be avoid or denied upon that ground.

Appellants urge that their demurrer to the evidence at the close of the entire case should have been sustained because of plaintiff's contributory negligence. Presumably, this is on the theory that she is bound by whatever negligence her agents, the mother and husband, were guilty of in administering the medicine to her. But it must be remembered that the prescription *filled* was not the same as the one the doctor *gave*, and of which the mother was told when he made it. She had the right to assume that the one filled and handed to her to administer to her sick daughter was the same of which the doctor told her. As the prescription was made by the doctor, it called for *1 dram* or teaspoonful to be given *at once.* As such it was not an overdose or dangerous. Plaintiff's mother says she could not read the prescription as filled. The danger and injury to plaintiff, in the attempt to give all of it and *at once* as the correct prescription called for and as the doctor had told the mother, lay in giving the medicine as prepared at the drug store after the alleged talk to the doctor over the telephone (which, if done, the druggist had no right to do), and of this the mother knew nothing. Magady, the defendants' clerk, who filled the prescription as written by the above mentioned defendant, says: "I didn't fill the one for ergot because I couldn't make out the directions and the

quantity on the prescription. I had never seen a prescription for that small a quantity. I tried to call the doctor, I called two different telephone numbers but didn't get him. John Small was in the place at that time. He and I had some conversation about this prescription. After we had this conversation he went back in the prescription room and came out in a few minutes and said to fill the prescription. I got some orders and instructions from him. As a result of getting those instructions, I went back to fill the prescription. We have ergot on hand and it comes in a bottle of various quantities from a pint to a gallon. I just had to pour it from one bottle into this (indicating). When I went back to fill the prescription, I found this paper which is marked for identification as defendants' exhibit No. 5. I filled it, . . ." Under all the circumstances, how can it be said that plaintiff was guilty of contributory negligence as a matter of law? [Hendry v. Judge & Dolph Drug Co., 245 S. W. 358.] The cases cited by appellants, Fowler v. Randall, 99 Mo. App. 407; Furtis v. Capitol Stage Lines Co., 27 S. W. (2d) 747, 750; Fisher v. Golladay, 38 Mo. App. 531, are on facts so entirely different that they are not deemed to be in point.

Complaint is made of plaintiff's instruction No. 2 in that it "is involved, and so worded as to require careful and critical examination to determine what is meant by it, and is therefore erroneous as tending to becloud the issues, and is misleading and confusing to the jury." The above assignment is very general and does not specifically point out wherein the instruction is confusing or misleading. It is true that there are many "if so's" in it which could have been omitted, but it does not contain conflicting, equivocal or contradictory statements so as to make it reversibly erroneous. In substance, it tells the jury that if they believe from the evidence that plaintiff, through her husband, ordered a prescription filled, and if they found from the evidence that said prescription was only for one dram of ergot and that the physician writing it did not orally authorize any change in it, and that, all of it under the physician's instruction was to be taken immediately, and that defendants negligently made up an ounce of it in violation of the physician's prescription, and if the jury further found that the plaintiff while in the exercise of ordinary care took enough of it so as to poison her, and that the quantity was so large as to be poisonous, and was a larger amount than was named in the prescription as written by her doctor and that the amount named in the prescription as written by her physician would not have been poisonous, and if the jury further found that plaintiff was thereby directly injured, then the finding should be for plaintiff. We fail to see wherein the instruction is open to the general charges above made to it. Neither does it "broaden the issues" arising under the first amended petition and the evidence. If the instruction contains anything which appellants seem to think

is new, it is to cover the issue of contributory negligence raised by defendants' answer, and not as a new cause of action in plaintiff's case.

Appellants' complaint that the instruction "does not require the jury to find that the alleged negligence of the defendants was the proximate cause of 'plaintiff's alleged injuries,'" is not well founded. The instruction, after submitting the issues as to negligence, contained a final condition before authorizing a verdict, namely, that if the jury further found that plaintiff was thereby "*directly* injured," then a verdict was authorized.

Neither does plaintiff's instruction No. 2 ignore defendants' theory of the case.

The refusal of defendants' Instruction "N" was not reversible error, (1) because, in the first portion thereof, it is somewhat argumentative in form and states too strongly the necessity of proving the extent of negligence on the part of defendants, before a recovery can be had, and for that reason the instruction might be confusing, and misleading to the jury; (2) that part of the instruction, as to the necessity of finding that such negligence, if any, *caused* plaintiff's injury, was (in effect though not in the same words) contained and submitted in defendants' given Instruction "I" and also in plaintiff's Instruction 2 (as above stated).

Point 4 of appellants' "assignments of errors" and of its "points and authorities" is not entirely clear. But if we can correctly gather from what is said in their brief, it is that the court erred in refusing to admit in evidence, in defendants' behalf, plaintiff's first or original petition. Of this it can be said, (1) the record shows that the original petition was admitted in evidence when it was offered by defendants; (2) the plaintiff made no objection, and the entire original petition was read to the jury by the defendants. The remark made by the judge, when the original petition was offered and the offer was being considered and discussed, can in no sense be considered as addressed to the jury or as an instruction "not to consider it." (3) No objection was made to the remark nor exception saved. Defendants, therefore, cannot complain of the introduction of the original petition in evidence (Berry v. Adams, 71 S. W. (2d) 126), nor of the remark of the judge (which, in our opinion, was harmless in any event). [Reed v. Prudential Ins. Co., 73 S. W. (2d) 1027.]

Point 5 of appellants' brief goes back again to a complaint as to plaintiff's instruction No. 2, and has already been answered and disposed of. Appellants asked fourteen instructions, of which eleven were given, with only a slight modification of the last one. The case was fully covered by instructions.

There being no reversible error shown, the judgment should be, and is, affirmed. All concur.