## NEW YORK LIFE INS. CO. v. CALHOUN.

### No. 11492.

Circuit Court of Appeals, Eighth Circuit.

Aug. 2, 1940.

Rehearing Denied Aug. 22, 1940.

Writ of Certiorari Denied Nov. 12, 1940.

See 61 S.Ct. 141, 85 L.Ed. ——.

---

528

Vincent L. Boisaubin, of St. Louis, Mo. (James C. Jones, Jr., of St. Louis, Mo., Louis H. Cooke, of New York City, and Jones, Hocker, Gladney & Grand, of St. Louis, Mo., on the brief), for appellant.

William R. Gentry, of St. Louis, Mo. (John W. Calhoun, of St. Louis, Mo., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MOORE, District Judge.

MOORE, District Judge.

The appeal in this action at law is from a judgment of the District Court for the Eastern Division of the Eastern Judicial District of Missouri, based on the jury's verdict in appellee's favor and against appellant for the sum of $10,000 (the principal amount of the policy sued on) with interest thereon at 6 percent from December 4, 1935, to date of verdict, which interest amounted to $1,771.71; finding appellant guilty of vexatious delay in refusing to pay the loss and fixing appellee's damages at $750 and her attorney's fees at $3,225, making the total amount awarded appellee by said verdict the sum of $15,746.71.

The policy in question was issued under date of January 30, 1934, to William J. Calhoun. He gave his occupation as Vice-President of the Seidel Manufacturing Company; his age at his nearest birthday as 54, and named as his beneficiary his wife, Beulah C. Calhoun. The annual premium on the policy was $909.70.

The petition alleged the issuance of the policy for $10,000, the death of the insured on December 1, 1935, the performance of conditions; that the defendant vexatiously refused to pay, and asked for the face of the policy, interest and damages for vexatious refusal. The petition was filed in the State Circuit Court; the case was removed to the Federal Court, where the proceedings were stayed, by consent, pursuant to motion of defendant therefor, pending the outcome of a prior suit in equity between the same parties, in which the Insurance Company was plaintiff, and in which case the policy involved in the law action was sought to be cancelled, on the ground of misrepresentations in the application therefor. The lower court found the plaintiff Insurance Company was not entitled to have the policy cancelled for misrepresentations, and after appeal by the Insurance Company the lower court was affirmed. The appeal record in that case has been incorporated into the appeal record in this, the law case.

The mandate of this court in the equity case reached the lower court on August 3, 1938. On October 19, 1938, defendant in this action filed its answer.

The answer admitted the validity of the policy and the liability of the defendant for the full amount of $10,000 by reason of the decision of this court (in New York Life Ins. Co. v. Calhoun, 8 Cir., 97 F.2d 896, 897), determining the suit for cancellation against the company. The answer denied the refusal to pay was vexatious and without reasonable cause, and in this connection alleged that upon filing the proof of death of William J. Calhoun, which the defendant received on December 4, 1935, it at once investigated the cause of death and the truth or falsity of the statements made by him in his application for the policy; that on December 23, 1935, it received from the physician who attended Calhoun, and who made out the proofs of death and signed the death certificate, a definite statement that on November 2, 1933, the said Calhoun had had a gastric hemorrhage; that the application for the policy was dated January 24th and 25th, 1935; that further investigation disclosed that this hemorrhage was a result of a diseased condition of the blood vessels; and that the insured died from hemorrhages from the diseased blood vessels on December 1, 1935.

The answer alleged that from this and other information obtained it appeared to it that the insured had materially misrepresented the facts in his answers in the application for the policy, and upon advice of counsel defendant filed suit on January 9, 1936, to cancel said policy because of said misrepresentations.

The answer alleged that the deposition of the physician who attended insured and gave the defendant the information aforesaid, taken shortly after the filing of the equity suit, confirmed the facts above stated and fully established defendant's grounds for cancelling the policy.

The answer then alleged that pending the trial and appeal in the equity suit the law action was stayed; that defendant fully believed, on advice of counsel, that under the facts and law the equity suit would be finally determined in its favor, resulting in a cancellation of the policy, and had no cause to believe it would be liable under the policy until the equity suit was decided adversely on July 18, 1938.

The answer alleged the investigation of facts coming to its knowledge concerning the question of misrepresentations, and of Calhoun's knowledge of his condition of health prior to his application, which investigation did not end until October 6, 1938. That upon the completion of this investigation, counsel for the defendant were of the opinion that the new and additional facts were insufficient to establish a defense of misrepresentation in view of the peculiar character of the opinion of the Court of Appeals in its decision in the equity suit; that counsel, therefore, and on the same day (October 6, 1938) offered to pay to the plaintiff, through her counsel, the full amount of the policy, together with interest thereon at six per cent per annum from the date of the receipt of proof of death (December 4, 1935) to the date of said offer (October 6, 1938) and the costs of court accrued to said date; that counsel for plaintiff refused said offer. The answer renewed the said offer and offered to tender into court the amount involved for the benefit of plaintiff.

The insured died on December 1, 1935. Proofs of death were furnished the Company on December 5, 1935. The proofs, signed by Dr. Seabold, disclosed that Dr. Seabold had treated insured for "pyloric erosion" in November, 1933, and that the immediate cause of death was "hemorrhage-varicose veins-esophagus".

In his application the insured stated that albumin or sugar had never been found in his urine; he had never raised or spat blood; had never consulted a physician or practitioner for or suffered any ailment or disease of the heart, blood vessels or lungs, the stomach or intestines, liver, kidneys or bladder; that he had not consulted a physician or practitioner or been examined or treated by anyone within the past five years. His application did disclose a heart abnormality and for this reason the Company issued the policy at an advanced premium, making the advance in premium because of Calhoun's heart condition.

The insured in his application having given permission to interview any physician who had treated him, the company sent an investigator to inquire. The investigator reported that the doctor had treated insured in March, 1932, for acute nephritis, which responded readily to treatment and had cleared up by May 3rd of that year. He further reported that "on November 2, 1933, insured had a gastric hemorrhage which was treated"; that the insured had stomach trouble in May of 1934, pyloric erosion, but that the condition cleared under treatment.

On November 30, 1935, the insured again had a gastric hemorrhage; the doctor thought it was a recurrence of the ulcer, and though the insured went to the hospital and had blood transfusions, he died from hemorrhage. The doctor stated that he did not think that an ulcer could cause such bleeding and ordered an autopsy, which revealed that an aneurism had developed and ruptured, causing death. The doctor stated that he found a perfectly normal stomach; stating that "there is no connection whatever between the stomach condition for which I treated the insured and the rupture which caused his death". The doctor also wrote to the company as follows:

"December 20, 1935

"New York Life Ins. Co.,

"818 Olive St.,

"St. Louis, Mo.

"Gentlemen:

"At the request of your representative, Mr. J. L. Glen, for more detailed information in the case of William J. Calhoun, I enclose the following data.

"I have been Mr. Calhoun's medical attendant for about ten years. During that period I treated him for numerous colds, and minor ailments. On March 15, 1932, he came to my office with an acute nephritis. The urine contained many red blood cells, few granular casts, and a large amount of albumin. This condition progressed favorably and he was discharged on May 3rd with normal urinary findings.

"On November 2, 1933, he had a moderately severe gastric hemorrhage. No x-ray examination was made at this time. This condition cleared readily and I did not see Mr. Calhoun until May of 1934 when he again complained of gastric discomfort. An x-ray examination at this time was made on April 30 by Dr. E. C. Ernst of St. Louis, who reported a pyloric mucous

erosion or ulcer. Under ulcer regime Mr. Calhoun made a rapid recovery and I did not see him again until November 29, 1935.

"On this date he had a severe gastric hemorrhage. This was followed by rapid hemorrhages during the following twenty-four hours. On the evening of November 30, following a severe hemorrhage at his home, I had him removed to St. Mary's Hospital where he was given an immediate blood transfusion. Another severe hemorrhage occurred about midnight, and another in the early morning hours of December 1. About 7 A. M. he was given a second blood transfusion. At noon on December 1 he had a very severe hemorrhage and expired.

"A partial autopsy, performed about two hours after death, revealed a perfectly normal gastric mucosa. The cardiac end of the esophagus was unusually patent admitting better than two fingers, and, about three inches above the cardiac end of the esophagus, a large group of varicose veins were disclosed. There was a moderate degree of hepatic cirrhosis. The hemorrhage undoubtedly originated from a rupture of one of these enlarged esophageal veins.

"Trusting that this will be the information you desire, I am,

"Very truly yours,

"J. A. Seabold."

The company decided to contest payment and turned over the file to its St. Louis attorneys.

On January 9, 1936, the attorneys filed suit in the U. S. District Court for the Eastern District of Missouri seeking cancellation of the policy on the ground of fraud, and for the reason that the incontestable period would run and terminate on January 29th, the day the answer to the petition was returnable. The original petition alleged that the insured was guilty of fraud in stating that he had not consulted a physician and that he had no disease of the stomach, intestines and kidneys. Early in February, Dr. Harris was asked to interview Dr. Seabold for the Company. He complied, and on February 21st wrote a report, which is here set out:

"February 21, 1936.

"Jones, Hocker, Gladney and Jones,

"705 Olive Str.,

"St. Louis, Mo.

"Gentlemen:

"At your request I interviewed Dr. E. C. Ernst, Dr. B. Portuondo and Dr. J. A. Seabold relative to their opinion as to the cause of death of William J. Calhoun.

"I examined the X-ray plates taken April 30, 1934, by Dr. Ernst and went over the history of the case with him. Mr. Calhoun was referred to Dr. Ernst by Dr. Seabold for the purpose of determining the cause of haemorrhages from the stomach, and from the X-ray plates and fluoroscopic examination Dr. Ernst made a probable diagnosis of gastric erosion or gastric ulcer.

"The plates show no evidence of thickening of the wall or contraction or adhesions and, in view of the post-mortem findings, Dr. Ernst is of the opinion that there was no gastric ulcer, but all the bleeding arose from a localized area of widely dilated veins in the oesophagus.

"Dr. Seabold's statement agrees with his letter dated December 30, 1935. He has known Mr. Calhoun for over ten years, during which period he has been the family physician. The first notation in his office records shows that Mr. Calhoun came to Dr. Seabold's office March 1st, 1932, complaining of having felt weak and tired for about ten days. Examination of the urine showed the presence of albumin, casts and red blood cells. His condition rapidly improved and on May 3rd there was no evidence of albumin, red blood cells or casts.

"He next saw him on November 2nd, 1933, because of a gastric haemorrhage, evidenced by nausea and vomiting of blood. There was no return of this bleeding until April, 1934, at which time he was sent to Dr. Ernst for consultation and X-ray diagnosis.

"In the meantime he went to see Dr. Seabold on January 23, 1934, for a general physical examination. Dr. Seabold at this visit found him free from any evidence of disease except for a moderate hypertrophy of the heart, attributed to his earlier strenuous exercise as a member of a rowing crew. (The policy was applied for the following day.)

"Dr. Seabold did not see him again until he was sent for because of another haemorrhage November 29, 1935. On the 30th he was taken to St. Mary's Hospital where he died, the result of uncontrollable haemorrhage.

"Dr. Portuondo's report of the autopsy agrees in the main with his present opinion, except that he admits his diagnosis of cirrhosis of the liver is without adequate foundation and was given in order to ex-

plain the presence of dilated veins in the oesophagus.

"This plexus of dilated veins was localized, and described by Dr. Seabold as having the gross appearance of a group of coiled earthworms.

"I examined sections of the liver and oesophagus in Dr. Portuondo's office in the University. As to the liver, there is a small increase of connective tissue around some of the lobules, but there is not enough to have interfered in any way with the portal circulation. Dr. Portuondo shares this opinion.

"In the oesophagus there are large spaces filled with blood, and enclosed in a very thin wall. This very thin partition separates one space from another. The appearance is characteristic of the typical haemangioma cavernosum.

"This is a congenital anomaly of the blood vessels at this point. In all probability the condition progressed steadily during life.

"The absence at the autopsy of the slightest indication of an ulcer of the stomach, either fresh or healed, and the presence of this localized tumor of blood vessels must lead to the conclusion that all of previous haemorrhages, as well as the final one, were the result of a rupture of one of these dilated and thin walled vessels.

"In this opinion and conclusion Drs. Ernst, Seabold, Portuondo and I concur.

"Yours very truly,
"D. L. Harris, M.D."

On March 15th the Company took the deposition of Dr. Seabold. Dr. Seabold stated that the four times he treated the insured for nephritis, he had not told insured that he had nephritis, but only a secondary kidney irritation. Asked when he next saw the insured, the Doctor answered:

"On November 2nd, 1933."

"Q. What was his condition then? A. He had had a gastric hemorrhage; at any rate, he had vomited blood; that was ten p. m., November 2, 1933. I got a call to his home and found the man lying in bed with a pulse of ninety, blood pressure of 100/60; · his color was good; he didn't show any evidence of the hemorrhage; I was rather reluctant to believe that he had had much hemorrhage.

"Q. You were there at that time while he was having the hemorrhage, or right afterwards? A. No, he had evidence of blood on towels and things in the bed with him.

"Q. Where did the blood seem to come from? A. He vomited it; that is all; it was from his stomach or somewhere in the vicinity of the stomach; it wasn't a thing that came from the lung. I could find no evidence of hemorrhage from the nose or throat, so the blood undoubtedly came from the intestinal tract.

"Q. When did you next see him? A. I saw him the following morning.

"Q. What did you do for him at that time? A. I put him quiet in bed with ice packs to his abdomen, gave him morphine and atropin and restricted everything by mouth, he got nothing, not even water, chips of ice only that night; the following morning I saw him and he had vomited several times through the night; the last two times there was no evidence of blood; blood pressure was 124/80, pulse of good volume, and he didn't appear particularly sick. That was the last time I had occasion to see him, none of these things impressed him very deeply; I didn't see the man again from November 3, 1933, until June 23, 1934. That was the last I saw of any bleeding. I told him at the time that the thing lacked the characteristics of ulcer; he didn't have the indigestion or pain; I was suspicious he might have some varicose veins in the stomach.

"Q. In November, 1933? A. Yes. I told him sometimes those hemorrhages come as a result of varicosities some place about the stomach. He vomited twice during the night after I saw him—or he vomited several times, but. the last two times there was no blood.

"Q. Did you discuss with Mr. Calhoun what might have been the cause of those hemorrhages? A. Oh, yes, he wanted to know what I thought it was. I told him the thing didn't present a true picture of an ulcer. The only other possibility would be a varicose vein in his stomach; we see those things rather frequently; people have hemorrhage from the stomach and our findings are negative. He apparently accepted it that way, because he didn't come to my office and didn't consult me again between November, 1933 and June, 1934.

"Q. January, 1934, wasn't it? A. Yes, January 23d; this looked like June.

"Q. What was his condition then? A. He then came in, he said he was rather

belated about it, but he thought he had better come in for a check up; I checked over him at that time and found him in excellent condition. His urine was entirely normal.

"Q. Did he give any special reason why he wanted you to go over him that day? A. No, as I got it, it was just that he wanted to know how he was getting along; it was in November he had had that hemorrhage, and he passed things up until January 23, 1934; when he came in to be checked over; his condition was excellent at that time; he had a blood pressure of 158/95; his urine was free of albumin and sugar, faintly acid, and microscopically negative. Mr. Calhoun had an athletic heart, which dated back to his youth; his heart was moderately enlarged; he had what is definitely known as 'athletic heart', a hypertrophic condition of the heart muscle, due to strenuous athletic work in his youth."

In the deposition the doctor stated that insured did not take his indispositions seriously. "He got to feeling better; that is all there was to it; none of these things seemed to impress Mr. Calhoun, he had such a splendid physique and was ordinarily in such excellent shape, nothing put him down; he didn't have any neurasthenic tendencies that would force him to dwell on any of these things". Speaking of the cause of death, the aneurysmal varices, the varicose veins in the esophagus, the doctor said the condition was very unusual, "that sort of thing couldn't come suddenly; that is a thing that must have developed over a period of years; he didn't show any evidence of hemorrhage except in the last two years. How long it would take a thing like that to develop is purely a matter of guess work; the situation is so rare, we have no means of observing that; we can only do that by comparing it with varicose veins in other areas. People don't develop varicose veins in the legs until they get to forty or fifty.

"Q. Did these hemorrhages result from the vein condition you found in the esophagus? A. Oh yes.

"Q. All the hemorrhages he had—the one in November? A. Oh, yes; I don't think the stomach condition had anything to do with that.

"Q. You think all the hemorrhages were the result of that? A. Yes; I don't think he ever had a hemorrhage from his stomach.

"Q. That vein condition must have developed before he had the hemorrhage? A. It was in the process of development, at any rate.

"Q. It gradually reached a stage of fullness in these veins, a plethoric condition of the blood, that eventually caused the breaking down of the walls of the veins, and that is what caused the hemorrhage; is that the way it worked out? A. Yes; every time the man would swallow food or nourishment, it would have to pass over these veins; this ulcerative thing could not have existed over a longer period than—

"Q. Ordinarily when you have a hemorrhage from a duodenal ulcer—the duodenum is down near the entrance from the stomach to the large intestine? A. Yes.

"Q. In a hemorrhage from a duodenal ulcer, you generally pass blood through the bowels and you see evidence of it in the stool? A. Yes, and you see the same thing in this.

"Q. Did you see evidence of that in his case? A. Yes, he had tarry stools. That is what made the diagnosis so difficult; you got the same picture you would get from a hemorrhage anywhere in the intestinal tract."

On cross-examination the doctor stated that this disease could not have been discovered except by putting a bronchoscope down there, and said he wouldn't want to be the man to do that.

The equity case was tried on an amended petition filed by the insurance company on March 26, 1936. The petition prayed for the cancellation and rescission of the policy in suit and that the beneficiary named in the policy be enjoined from bringing action thereon. The grounds for the relief sought were the alleged false and fraudulent answers of the insured to certain questions in the application which the company relied upon as true when it issued the policy.

The application by the terms of the policy was made a part of the contract. The petition alleged that the application contained false and untrue statements and representations, in that the insured in the application, to the questions "7E. Have you ever raised or spat blood? 8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of * * * (b) the heart, blood vessels or lungs * * *?" answered each question "No".

Upon the trial of the equity case the Company called Dr. Seabold as a witness. He gave the following testimony about the hemorrhage he had noted on November 2nd, 1933:

"I did not have occasion to treat him again from May 3, 1932, until November 2,, 1933, when I was called to his home at ten o'clock that night. The history I got then was that he had done some vomiting. He described it as something that looked like coffee ground vomitus, and he was afraid that it might be something—a hemorrhage of some kind. He was not particularly shocked; he was lying in bed perfectly comfortable. He had a pulse of 90, but he didn't show any evidence of shock, and there was nothing to indicate that he had had a serious hemorrhage.

"Q. Did he tell you he had a hemorrhage? A. He told me he had vomited this coffee ground material and I interrogated him rather closely about what he had eaten, whether he had taken anything into his stomach that might resemble blood, or certain vegetables that would give it that coffee ground appearance. I am not absolutely clear as to whether or not I saw the stuff he vomited. I had occasion to see him several times for this thing, and, if my recollection serves me correctly, I don't believe I saw what he vomited that first time, in November. But I made him stay in bed, put him on a liquid diet, and I gave him a hypodermic sedative. He showed no evidence whatever of any loss of blood. I mean, he was not shocked. He had a pulse of 90. One who has lost a noticeable amount of blood is apprehensive and fearful, but he showed no such symptoms. He was lying in bed laughing; as a matter of fact, I talked to him for about a half hour about everything in the world but his condition. As to whether or not this matter which he vomited came from the intestinal tract, or some other interior part of the body, it might come from anywhere—from the mouth on down. Of course it came out through his mouth. He described the vomitus to me as coffee ground material. Blood that has been taken into the stomach and kept there for any length of time is changed into that sort of material by the gastric acids and digestive ferment, so that we are always suspicious of a coffee ground vomitus. Most often it does mean some loss of blood.

"I discussed with him the characteristics of this hemorrhage and an ulcer hemorrhage. I told him—he had had no pain whatever; there was not a thing about him to suggest an ulcerating thing. You couldn't get a history of pain after taking food or when the stomach was empty. The whole thing was ephemeral. So, I told him that there were some varicose veins about his stomach or pharynx, or somewhere along the gastro-intestinal tract, that had broken loose, a thing that happens very frequently, and a thing which didn't have any significance.

"That was the night of November 2, 1933, at ten o'clock. I next saw him the following morning, and he complained that the hypodermic which I had given him the previous night had nauseated him. I discovered later that he could not tolerate morphine, as it made him violently sick. He had vomited several times during the night, but there was no blood in that vomitus. On November 3, 1933, the blood pressure was about normal. I had difficulty in persuading him to stay in bed, but I insisted upon his staying at home and following a rigid diet. I placed him on a bismuth preparation as a safeguard against any further bleeding, if there had been any."

The doctor described the cause of the insured's death substantially as in his deposition. This witness further testified:

"You took my deposition in the case which is now pending in the State Court, some time ago. You asked me with respect to this November 2d hemorrhage, what his condition was, and at that time I said: 'He had had a gastric hemorrhage; at any rate, he had vomited blood; that was ten P. M., November 2d, 1933'. That agrees with my notation here. And you said to me during the taking of that deposition: 'You were there at that time while he was having the hemorrhage, or right afterwards?' I said: 'no, he had evidence of blood on towels and things in the bed with him.'"

"Unfortunately, I had made a visit—I told you at that time that I had not seen Mr. Calhoun between that date and May, but I discovered afterwards that I had been to his home on another date, April 25. You will find in that deposition I told you that he had telephoned me that he had trouble—I will explain why this uncertainty has come up. I told you that he had telephoned me that he had trouble and had had additional bleeding, and that I insisted that he should go immediately for an X-ray examination. I told you that on April 25, 1934, he had telephoned me.

Here is what happened: Frequently you will go out to see a patient and that notation is not made on the office card; that is what happened here. So, that brought up the question. I did see a hemorrhage at that time, in April, 1934. I had those two dates confused, so that I cannot honestly say that I saw any evidence of hemorrhage at that time in November. I recall now that it was in April that I actually saw blood, and then clamped right down on the thing and insisted on an X-ray examination. I am positive about having seen the blood in April.

"Q. But you do not definitely remember having seen any blood that you think he vomited in November? A. And the omission of that visit in April is what confused me in those two dates.

"Q. However, I asked you in this deposition, with respect to the November hemorrhage, where the blood came from, and you said he vomited it. A. It came from —whatever it was—he vomited it. Now, whether it was on November 3 that I saw the blood on the towels, or whether it was the April set-up, I say I saw this thing—I followed this case over a year or more; I followed this thing from November, 1933, to December 1, 1935, and it is just a little bit difficult to keep those points absolutely clear, in all that time.

"Q. How long after you see the patient do you make your notes on your office record? A. I saw this man in November at 10:00 P. M. at night. This notation was made the following morning.

"My record does not say that I saw blood, but it shows that he had a gastric hemorrhage. That notation was made on the morning after I saw him, the morning of November 3, 1933.

"I would make that notation from calling on a patient and having him tell me that he vomited coffee-like material, which he thought looked like bloody material, and on that basis I would make that notation on my card. That was my opinion at that time, that he had some blood pass from the gastro-intestinal tract. A doctor's opinion may be absolutely based upon what someone tells him, as well as upon what he sees. I also made the notation, following that note, that there was no particular shock; the man had a pulse of 90, and that his blood pressure was all right. So, I left the way open for myself there for subsequent observation.

"A man can have a gastric hemorrhage without spitting blood. He could have a hemorrhage from the stomach that would pass through the intestinal tract. He would not necessarily have to vomit. It is the rule, however, that they do vomit.

"He told me that he had vomited this coffee ground tarry-like material, as I recall it. I asked him if he thought it was blood, and he said he was not sure about it. He said it was tarry-like, and that he was nauseated and sick at his stomach. I questioned him fully about what he had eaten, or evidence of pain, or anything else that would substantiate a diagnosis of gastric hemorrhage. But the only thing I could get out of the story was this coffee ground vomitus, without any shock symptoms of a hemorrhage to support it.

"He told me that he had vomited this coffee-like substance, and from what he told me, I put it down that it was my opinion that it was a gastric hemorrhage through the mouth. It might possibly have been something other than blood which caused that coffee ground material, such as berries, sometimes spinach, and sometimes a few things of that kind will cause the dark brown vomitus.

"If this varicose condition existed over a long period of time, and this condition that he had in November, 1933, is a little more than two years prior to the time he died, I would say yes, that Mr. Calhoun must have had some varicose condition in those veins at that time. Those varicosities were subject to being irritated by the swallowing of food, which is probably what caused them to break, or the pressure of thin walls eventually—the walls become so thin from pressure that they break down.

"These X-rays which were taken on April 30, 1934, did not disclose this varicose condition. They could not show this. There is no way that these things could be discovered except by the introduction of the bronchoscope or the esophagoscope."

The doctor testified on cross-examination, that the trouble insured had with a wrist pain of arthritic nature and with his kidneys had nothing to do with his death. He stated that the symptoms that usually occur with a hemorrhage had been absent on his November 2nd call, and that the coffee grounds substance in insured's vomit were what insured had observed and told him about. He stated he had seen blood on the towels in April, not November. The

doctors' records which showed a visit for hemorrhage then were held inadmissible.

Dr. Portuondo, who performed the autopsy, testified that the death was caused by the rupture of the varicose veins in the esophagus. It was his opinion that the varicose condition was incipiently present from insured's birth and that they were in a condition to rupture within ten years of his death. He thought they might have ruptured on November 2nd, and he could have had one then.

Dr. Harris agreed when questioned on the same matters; he testified further that there was no way that the insured could know of his condition. When Dr. Harris was asked about his interview with Dr. Seabold, the beneficiary objected on the ground that the insurance company sought to impeach its own witness: the insurance company claiming ,surprise, the beneficiary objected that the Company had not laid the foundation by asking leave to cross-examine and asking Dr. Seabold if he had made certain statements to Dr. Harris. This objection was sustained. Dr. Seabold was recalled and examined to cure the objections, and the deposition was received, as was subsequent testimony of Dr. Harris on the conversation he had had with Dr. Seabold.

The Company Medical Supervisor from New York testified by deposition that if the insured had revealed that he had had nephritis in the spring of 1932, the Company would not have issued the policy; that if it had known of a hemorrhage in November, in 1933, it would not have issued the policy. He testified that the heart condition alone was sufficient to make the insured a questionable risk.

A member of the Company's Classification Committee testified by deposition on the rating up of the loss, and a member of the Sub-Loss Committee testified by deposition about the decision to contest payment.

The beneficiary called two witnesses, each friends of the deceased. Each testified that the insured had been robust in health and each spoke of the insured's saying that he had been sick and vomited on November 2nd; one of them said there was suspicion of ptomaine, that no nephritis had been spoken of, only rheumatic pains. The insured's mother-in-law who lived with him and her daughter, the beneficiary, testified that on the evening of November 2nd the insured had eaten for din-ner the menu that Dr. Seabold had testified might give the coffee grounds appearance: lobster, spinach, celery, black coffee. She said the vomitus "just looked like he was throwing up his supper". She had gone in to see about him and cleaned up. She saw no blood, but recalled that in April there had been some. Etta Carey, the colored maid of the Calhouns, said there had been no blood on towels or sheets in November; she judged by the laundry and sheets, as she was not present when the vomiting occurred. The beneficiary testified that they had had crab meat on toast, spinach and coffee to eat that night; that there was no blood then. She did see the blood in April.

On the trial of the Equity case the trial court found as a fact that the insured had not at any time prior to the making of the application for the policy in question vomited blood and that there was no evidence to show that at the time of his death the insured had any disease of the stomach, intestines, bladder or kidneys and that the deceased died on or about December 1, 1935, as the direct result of hemorrhage on that day and on the preceding day, caused by a rupture or ruptures of varicose veins in the lower part of the esophagus; the condition in the esophagus being known by the medical term "aneurysmal varices" and that while the "insured did in fact have an enlarged heart said condition was known to the plaintiff (insurance company) when said application was made and when said policy was issued and that on account thereof, a higher premium was charged for said policy than would otherwise have been charged" and "that said heart condition in no wise contributed to the death of the insured" and "from the evidence that the condition of the insured's esophagus from which the fatal hemorrhage resulted was of long standing, but that it was never known to the insured at any time nor was it known to or suspected by any physician who had examined or treated him."

The trial of this cause before Judge Davis and a jury consumed three days, the verdict being returned on November 18, 1938. The ruling of the Court on the motion of defendant for a directed verdict on the issues of penalties, damages and attorneys' fees was reserved. Judgment having been entered upon the verdict, defendant filed its motion to set aside the verdict and judgment and to enter judgment for defendant, or, in the alternative, to grant it

a new trial. This motion having been overruled, defendant prosecutes its appeal.

■ The issue presented by this appeal is the right to recover damages for vexatious refusal to pay the policy. The statute under which plaintiff seeks to recover is Section 5929, R.S.Mo.1929, Mo.St.Ann. § 5929, p. 4515. It reads: "Damages, when recoverable. In any action against any insurance company to recover the amount of any loss under a policy of fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance, if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed ten per cent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict." The meaning, purpose and effect of the statute just quoted is to be determined by the interpretation placed thereon by the Supreme Court of Missouri.

In Non-Royalty Shoe Co. v. Phoenix Assurance Company, 277 Mo. 399, 210 S.W. 37, 42, the Supreme Court, speaking through Judge Faris, said:

"This is a penal—indeed a highly penal —statute, and so it ought to be strictly construed. No one ought to be allowed to profit by it, unless he brings himself strictly within the letter of its provisions. * * *

"We are convinced that a vexatious refusal to pay an insurance loss is not to be deduced from the mere fact that upon suit the verdict is adverse to the defendant. Patterson v. [American] Insurance Co., 174 Mo.App. [37] 44, 160 S.W. 59; Keller v. [Home Life] Insurance Co., 198 Mo. 440, 95 S.W. 903. If the fact of an adverse decision is to constitute the sole and decisive test, it would be fairly plain that this court was in error when it held the statute to be constitutional; for it is only upon the fundamental ground of a vexatious refusal to pay that the penalty inflicted by the statute can be upheld. The defendant is to be allowed to entertain an honest difference of opinion as to its liability, or as to the extent of such liability under the contract of insurance, and to litigate that difference; otherwise the provision of the statute is obviously so shot through with duress as to be invalid upon any view. It is from the very nature of the case, and from the protean form which the facts of the case assume, difficult, if not impossible, to frame any general rule for use in determining when a refusal to pay is vexatious and when it is not. Judge Trimble, of the Kansas City Court of Appeals, has announced a rule, which commends itself to us so far as it goes, and it goes as far as it is wise or safe to go in announcing a rule to govern cases wherein the facts are as variant as we find them in insurance cases upon this question. This rule reads thus:

" 'And while affirmative proof is not required to show vexatious refusal, yet the penalty should not be inflicted unless the evidence and circumstances show that such refusal was willful and without reasonable cause as the facts appeared to a reasonable and prudent man before the trial; and merely because the judgment, after trial, is adverse to defendant's contention, is no reason for inflicting the penalty.' Patterson v. American Ins. Co., 174 Mo.App. loc. cit. 44, 160 S.W. 62.

"In the case at bar there was no refusal to pay after the time at which, by the terms of the policy, defendant became bound to pay. And while lapse of such time would not, of course, always be the true test, since the vexatious and recalcitrant attitude of the defendant might by the proof be shown to be such as that a delay to sue for the 60 days allowed would be futile, yet there is not in this case any showing of any such attitude. Young v. [Pennsylvania Fire] Insurance Co., 269 Mo. 1, 187 S.W. 856; Fay v. [Ætna Life] Insurance Co., 268 Mo. [373], loc. cit. 389, 187 S.W. 861. We are constrained to say that there was not in evidence any substantial facts upon which to base a finding of any penalty for vexatious refusal to pay the loss, and if upon a new trial none be offered, this issue ought not to be submitted to the jury."

■ In the case above cited (Non-Royalty Shoe Co. v. Phœnix Assurance Company) it will be noted that the Supreme Court of Missouri, speaking through Judge Faris, announced the below mentioned principles in connection with the question of liability under this statute: (1) The refusal must be vexatious. (2) The defendant is to be allowed an honest difference of opinion as to its liability. (3) The defendant is to be allowed to litigate that difference. (4) (Unless the foregoing latitude of action be allowed to the defendant, the statute would be unconstitutional.) (5) No

penalty can be inflicted unless the evidence shows two things: First, that the refusal was willful and, secondly, that it was without reasonable cause; and these things must appear to a reasonable and prudent man before the trial. (6) The adverse outcome of a trial is no reason for inflicting the penalty. In Aufrichtig v. Columbia National Life Ins. Co., 298 Mo. 1, 249 S.W. 912, the Supreme Court added the following principle: (7) If the insurance company acts in good faith it may contest an issue of either fact or law without the danger of penalties. This further principle is announced in State ex rel. Continental Life Ins. Co. v. Allen, 303 Mo. 608, 262 S.W. 43. (8) The right to resist payment is, primarily, a question of law to be determined by the facts as they reasonably appeared before trial, and not as they may have been found by the jury. Later, the following principle was announced in State ex rel. Gott v. Fidelity & Deposit Co., 317 Mo. 1078, loc. cit. 1095, 298 S.W. 83: (9) Where the legal question involved is one about which lawyers might well differ, there can be no vexatious delay. See, also, Camdenton Consol. School Dist. No. 6 v. New York Casualty Co., 340 Mo. 1070, 104 S.W.2d 319.

We have examined the authorities cited by the appellant in support of its contention that the court committed error in the submission of the question of vexatious refusal to pay the sum due under the policy in this case. We have no fault to find with the principles laid down in such authorities. The facts in the cases cited are clearly distinguishable from the facts in the case now before the Court.

In Curtis v. Indemnity Co. of America, 327 Mo. 350, 37 S.W.2d 616, 628, the Supreme Court had before it a suit on a policy of fire insurance on an automobile which had been destroyed by fire. The insurance company's adjustor promised to pay the loss in full and that promise was renewed on various occasions but never fulfilled. The jury's verdict was in favor of plaintiff, including damages and attorneys' fees. The Supreme Court held that the evidence justified the finding that the defendant was guilty of vexatious refusal to pay the loss. In that case the court, after citing numerous authorities and quoting from the decision in Patterson v. American Insurance Co., 174 Mo.App. 37, 160 S.W. 59, said: "However, if the reasonable inference may be drawn from a general survey of all the facts and circumstances in the case that the defendant's refusal to pay the loss under the policy of insurance was without reasonable or probable cause or excuse, then the issue of defendant's vexatious refusal to pay the loss is properly submissible to a jury."

In Exchange Bank v. Turner, 321 Mo. 1104, 14 S.W.2d 425, 433, the Court said: "Complaint is made also on the ground that the facts did not warrant the assessment for vexatious delay under section 6337, R.S. Mo.1919. It is true, as appellants say, that insurance companies, acting in good faith, may contest either issues of fact or law without subjecting themselves to the penalties of the statute; and there are some issues of law in this case about which lawyers reasonably might differ. * * * But the mere presence of a real law question in the record will not of itself exculpate the defendant from a charge of willful obstruction if there is evidence that its attitude was vexatious and recalcitrant."

In Florea v. Iowa State Ins. Co., 225 Mo. App. 49, 32 S.W.2d 111, 115, the Court said: "We appreciate the fact that insurance companies, acting in good faith, may contest issues either of fact or of law without subjecting themselves to the penalty, but, even though there may be an issue of either character in the case about which lawyers might reasonably and honestly differ in their opinions, yet the attitude of the company in denying liability must not be vexatious and recalcitrant, else it may not be exculpated from the charge of willful obstruction."

In Coscarella v. Metropolitan Life Ins. Co., 175 Mo.App. 130, 157 S.W. 873, 876, the Court said: "It is true there is no direct and positive evidence to the effect that the delay in payment was vexatious; but such evidence—that is, positive and direct evidence—is not required. The jury are authorized in cases of this character to infer and conclude that the delay was vexatious from a survey of all of the facts and circumstances in the case tending to reveal the conduct of the insurance company with respect to the matter."

In the case of Rush v. Metropolitan Life Insurance Co., Mo.App., 63 S.W.2d 453, 456, the St. Louis Court of Appeals had before it an action by an administrator of a holder of a life policy. The defense was misrepresentation as to the condition of the health at the time of making the application for the policy. The verdict, in

favor of plaintiff, included an allowance for attorneys' fees on account of vexatious refusal to pay. The court, in upholding the verdict, on the subject of vexatious delay, said: "Here the defendant knew from the outset that the proofs of death contained contradictions in and among themselves. It knew of the findings of its own medical examiner tending strongly to support the claimant's right to a recovery on the policy. It also should have known that the hospital and dispensary records, strongly relied upon by it for its defense, as well as the testimony of the attending physicians corroborative thereof, would be inadmissible in evidence, absent a waiver of privilege on the part of plaintiff which it had no right to anticipate."

In Porter v. Equitable Life Ins. Society, Mo.App., 71 S.W.2d 766, 779, the Kansas City Court of Appeals upheld the right of the plaintiff to recover attorneys' fees on account of vexatious refusal to pay. In that case the court said:

"It has· also been held that, under circumstances where legal questions raised by a petition are such that lawyers may well differ honestly and reasonably concerning them, it is error to submit the question of vexatious delay. * * *

"But it has also been held that the mere presence of such issues in the case will not of itself exculpate the defendant from the charge of willful obstruction and delay if there is evidence that its attitude was, nevertheless, vexatious and recalci-- trant. * * *

"In the case of Curtis v. Indemnity Company of America, 327 Mo. 350, 37 S.W.2d 616, loc. cit. 628, it was said: 'However, if the reasonable inference may be drawn from a general survey of all the facts and circumstances in the case that the defendant's refusal to pay the loss under the policy of insurance was without reasonable or probable cause or excuse, then the issue of defendant's vexatious refusal to pay the loss is properly submissible to a jury.'

"There was not only evidence in the record from which it might appear that appellant, in good faith, asserted meritorious defenses, at least that questions were raised concerning which there was a place for honest difference of opinion; but there was also evidence tending to show that, notwithstanding the presence of such defenses and the good faith of appellant in asserting them, its action was nevertheless recalcitrant and obstructive, which made the issue as to vexatious delay a question for the jury and submissible.

"The records of the Loose-Wiles Company showed the premiums on the policy due from respondent had been paid to October, 1930; that 'respondent had been carried on the pay roll to January 1, 1930. Yet, appellant, regardless of such records, asserted that her employment had ceased November 2, 1929, and that her insurance had ceased and was not in force July 1, 1930. It was for the jury to say whether the assertion of such a defense, under the circumstances shown, was in good faith or without ·cause and excuse to obstruct and delay. There were other circumstances developed in evidence, not necessary here to· particularize, justifying the submission of such question to the jury. The submission of such question to the jury was not erroneous. Appellant's complaint under this· head is denied."

In White v. American Life & Accident Ins. Co., Mo.App., 90 S.W.2d 118, 120, a suit on a policy on the life of plaintiff's deceased husband, a verdict for the plaintiff included damages for vexatious refusal to pay. Discussing the insurance company's claim that such a finding was unwarranted by the evidence, the St. Louis Court of Appeals said:

"It is next argued that, for want of substantial evidence of vexatious· refusal on defendant's part to have paid the claim, it was error for the court to have submitted such issue to the jury.

"The determination of this point must depend, of course, upon whether or not there may be said to have been such facts and circumstances in evidence as to have formed a legitimate basis for the belief that defendant's refusal to pay was willful and without reasonable cause as the case would have appeared to a reasonable man before the trial. * * *

"Though there is undoubtedly something to be said in support of defendant's viewpoint that under all the facts of the case it should have had the right to contest the issue of its liability under the policy without subjecting itself to the penalty of the statute (section 5929, R.S.1929, Mo.St.Ann. § 5929, p. 4515), yet it must be granted, we think, that the question of its right to have refused payment is, after all, a fairly debatable one, which is but another way of saying that the issue of vexatious refusal was one for the jury to determine along with the other issues in the case. It must

be borne in mind, just as we have already pointed out, that defendant did not have a word of direct and positive evidence to the effect that the insured was actually suffering from a duodenal ulcer at the date of the issuance of the policy, and defendant is furthermore to be charged with knowledge of what its own evidence subsequently disclosed, which was that, even though the insured had had the duodenal ulcer in November, 1930, it would still have been entirely possible for him to have been cured of it by October, 1931, when the policy was issued and delivered to him. So we repeat that, while in the minds of some people there might be thought to have been a legitimate basis in the case for defendant's denial of its liability, yet other minds equally reasonably might very well conclude that from the circumstances noted defendant could not reasonably have expected the return of a verdict in its favor upon the issue of a breach of the sound-health provision of the policy, and consequently the issue of vexatious refusal must be held to have been properly one for the jury to be called upon to decide."

See, also, Friedman v. State Mutual Life Ins. Co., Mo.App., 108 S.W.2d 156; Novosel v. Mid-West Life Ins. Co. of Mo., Mo.App., 276 S.W. 87; Groves v. Great Eastern Cas. Co., 212 Mo.App. 316, 246 S. W. 1002; Reed v. Prudential Ins. Co., 229 Mo.App. 90, 73 S.W.2d 1027. In the latter case the action of the jury in allowing damages and attorneys' fees was approved and the appellate court called attention to the fact that changing ground for refusal to pay after a suit had been filed was evidence of vexatious refusal to pay.

The question of vexatious delay was submitted to the jury. In submitting such issue the trial court, after making reference to the statute of Missouri heretofore set out, gave the following instructions:

1. "The question here is, Did this defendant vexatiously refuse to pay this loss? Now, the vexatious—by a vexatious refusal to pay, we mean, Did the defendant, without reasonable grounds or excuse, litigate this policy and deny its liability thereon? And that is the peculiar question which is being submitted to you in this case on a life insurance policy and the question you will have to answer by your verdict is this: Did this defendant, without just cause or without excuse, and in bad faith, litigate this policy of life insurance? If you find from your consideration of this case that it did do that, that it liti-

gated this life insurance policy and delayed payment of the proceeds of this policy without reasonable grounds, without just cause or excuse, and in bad faith—if you find that, you ought to take the plaintiff's view of this case. On the other hand, if you determine that the defendant had reasonable grounds to question its liability upon this policy and that it did question it and did litigate it—I say, if you take that view, you ought to decide this case for the defendant. I mean on the issue of damages and attorneys' fees, you ought to decide for the defendant, because that is the only issue in the case."

4. "And the Court further instructs you that, if from the facts and under the instructions of the Court you find that the defendant New York Life Insurance Company vexatiously refused to pay promptly the amount of said policy to the plaintiff, and that as a result thereof plaintiff has been hindered and delayed in the collection of said sum of ten thousand dollars and interest, without any reasonable grounds so to do, and that the defendant's refusal was not in good faith, then in addition to the principal sum of said policy, to-wit, ten thousand dollars, and interest thereon at the rate of six per cent per annum from the 4th day of December, 1935, to the date of your verdict, you may allow the plaintiff damages in a sum not to exceed ten per cent of the principal sum of said policy, and you may also allow her such a sum as you find from the evidence to be reasonable compensation for the services of attorneys employed by her in both of said lawsuits, insofar as the same were necessary wholly to protect her rights under said policy."

5. "By the term 'vexatious refusal to pay' is meant refusal to pay the principal sum of said policy promptly, without reasonable grounds for belief on the part of the defendant that it was not legally liable to the plaintiff for the principal sum of said policy. If, in refusing to pay promptly, the defendant acted in good faith, and if it had reasonable grounds to believe that it was not liable under the terms of said policy, and reasonable grounds to believe that it might escape legal liability under said policy, then you should find that the refusal to pay was not vexatious, and, consequently, you should not allow the plaintiff any sum as damages, or any sum as attorneys' fees in this case. If, however, under the evidence and instructions of the Court, you find that the defendant, in view

of the established rules of law in the State of Missouri, with which it was presumed to be familiar when it refused to pay said policy, and in view of the facts which it had in its possession, and the facts which it could have discovered by a reasonable and fair investigation, did not have reasonable grounds to believe that it was not liable under the terms of said policy, then you may find that the defendant, in instituting and prosecuting said lawsuit, which it did institute, and in defending this case, did not act in good faith, and consequently, was guilty of vexatious refusal to pay the principal of said policy."

8. "As to whether or not the plaintiff is entitled to penalties for the refusal of the defendant to pay the policy, the Court instructs you that you may not assess such damages unless you find from the evidence that the refusal was vexatious; and in this connection, the Court instructs you that the mere refusal of defendant to pay, or an unsuccessful suit of the defendant to cancel the policy, is, in and of itself, no sufficient evidence of vexatiousness of the refusal. The statute of Missouri under which plaintiff seeks to recover damages for the vexatious refusal to pay is highly penal and should be strictly construed, and no one should be allowed to profit by it unless he brings himself strictly within the letter of its provisions; and so the Court instructs you that the defendant is to be allowed an honest difference of opinion as to its liability under the contract, and is to be allowed to litigate that difference. An insurance company that acts in good faith may contest either an issue of fact or an issue of law, without subjecting itself to penalties of the statute, and its refusal to pay is not vexatious in the sense in which that term is used in the statute, unless the refusal was willful and without reasonable cause as to the facts appearing to a reasonable and prudent man before the trial. With this explanation and test before you, the Court instructs you that, if you find from the evidence that before the trial of this case, the defendant had reasonable cause to believe, as the facts appeared to a reasonable and prudent man, that it was not liable under the policy, or that it honestly and in good faith believed it had a right to cancel the policy for what it honestly believed to be a misrepresentation of the insured in obtaining the policy, then it is not liable in this action for any penalties for its refusal to pay the policy."

9. "The burden of proof is upon the plaintiff to establish to your reasonable satisfaction, by the greater weight of the evidence, that the refusal of the defendant to pay the policy sued on herein was vexatious, as that term has been defined and explained to you in other instructions. The mere fact that the defendant refuses to pay the policy sued on herein is not of itself any evidence that the refusal of the defendant to pay said policy was vexatious; and before the plaintiff is entitled to recover ten per cent of the face of said policy as a penalty, or any sum as attorneys' fees, you must find that the defendant, prior to the trial of this case, had no reasonable grounds for refusing to pay said policy."

10. "The fact that the suit in Equity instituted by the defendant to cancel the policy sued on herein was decided in favor of the plaintiff, Beulah C. Calhoun, is not conclusive evidence that the refusal of the defendant to pay said policy was vexatious, and the jury cannot, simply because this suit was decided adversely to the defendant herein, in the District Court and in the Circuit Court of Appeals, allow the plaintiff the ten per cent penalty and attorneys' fees sued for in this case."

■■ To restate the facts disclosed by the record in this cause on the question of vexatious delay would extend this opinion beyond all reasonable length and would serve no good purpose. Affirmative proof is not required to show vexatious refusal to pay. Under the principles announced by the Supreme Court of Missouri as heretofore set out, we are of the opinion that the action of the trial judge in submitting to the jury the issue of vexatious refusal to pay was proper, and this alleged ground of error is denied.

The ruling just announced makes it unnecessary to discuss the assignment that the Court committed error in denying the request of appellant for a directed verdict on the question of damages and attorneys' fees.

■ The defendant contends that the Court committed error in its refusal to give, on its behalf, instruction VI-A. In instruction VI-A, the defendant asked the Court to instruct the jury "that defendant had reasonable and justifiable grounds for taking an appeal from the decree of the District Court to the United States Circuit Court of Appeals in the equity suit instituted by defendant to cancel the policy sued

on herein, and that the jury cannot find that the defendant was guilty of vexatious delay in the payment of said policy because it took and prosecuted an appeal from the adverse decree of the District Court to the United States Circuit Court of Appeals in the equity suit brought by it to cancel the policy."

The subject of this instruction was covered by the Court in Instruction No. 10 above set out. Having held that the Court did not commit error in formally submitting to the jury the question of vexatious delay and the subject of defendant's refused instruction having been covered by the Court, it was not error to refuse the above requested instruction.

█ It is next contended by the defendant that the Court committed error in its refusal to give instruction IX requested by it. In Instruction IX the defendant requested the Court to instruct the jury that "even though you find from the evidence that the refusal to pay the policy in this action was 'vexatious' as that term is defined and explained in another instruction, nevertheless the damages must not exceed 10 per cent of the amount of the policy and a reasonable attorney's fee for services rendered in connection with this law action alone, in an amount not to exceed $1,000."

Defendant contends that the refusal to give instruction IX was error for the reason that the plaintiff did not ask attorneys' fees for services rendered in the equity suit but only for services rendered in the law action, and the value of the services in question in connection with the law action did not exceed $1,000. The subject of this instruction was covered by the Court in instruction No. 4 set out above.

The defendant's proposed instruction sought to limit the attorneys' fees to the sum of $1,000, while the instruction of the Court authorized the jury, in the event they found vexatious delay, to allow plaintiff such sum as it found "from the evidence to be reasonable compensation for the services of attorneys employed by her in both of said lawsuits in so far as the same were necessary wholly to protect her rights under the policy."

It is next contended that the Court committed error in not granting a new trial on the ground that the verdict was excessive, in that it "included damages for attorneys' fees for services in the equity suit and should have been limited, even had there been vexatious refusal to pay, to attorney's fees for services rendered in the law case, to an amount not to exceed $1,000".

In support of this contention the defendant relies upon the allegations of the petition in this action which prays "for a reasonable attorneys' fee incurred in bringing *this suit*", which attorneys' fee plaintiff states is the sum of $4,000.

Mr. Wm. R. Gentry, Judge John W. Calhoun, Mr. S. Mayner Wallace and Judge Henry A. Hamilton testified as experts as to the value of legal services performed in this litigation. This question was propounded to Mr. Gentry:

"Q. Now Mr. Gentry, will you tell the Court what in your opinion is the value of the services performed in this litigation, how much they are reasonably worth?

"Mr. Jones: Just a minute, Defendant objects on the ground that there is no evidence in this case of any vexatious refusal on the part of the defendant to pay, and that it is, under those circumstances, not a proper case where any opinion could be expressed on the value of attorneys' fees.

"The Court: Overrule the objection.

"A. I cannot very well separate your services and mine in fixing the value of the services, and I prefer, if it is agreeable, to state my opinion as to the value of the services rendered by you and me, as well. In my opinion the value of all of those services is four thousand dollars. I think that is a fair, reasonable value for our services in the two cases, and I will, if it is agreeable, give you my ideas as to how that is divided as to the work in the different courts.

"Q. I will be glad to have you state that, Mr. Gentry. A. In my opinion, for those services rendered in the Equity suit up to and including the trial of the case, and the preparation of all the briefs before the decision of that case, a thousand dollars is a perfectly reasonable charge.

"For services rendered from the time when that case was decided on the 1st of July, 1937, on through the decision of that case by the United States Circuit Court of Appeals, in all the steps that were taken, which I have detailed here, as to services rendered by us after the decision of the District Court and on through the decision of the Court of Appeals, my opinion is that two thousand dollars is a fair allowance. There was a great deal more work in connection with that than there was in the work of the trial in the District

Court. That brings it up to three thousand dollars.

"And my opinion is that, for the preparation and trial of this case, one thousand dollars is a reasonable charge. That makes a total of four thousand dollars."

On cross-examination this question was propounded to the witness:

"Q. Mr. Gentry, if you were not allowed any attorney fees in this case, what do you think would be a reasonable charge on your part to Mrs. Calhoun for the services you have rendered? A. I think about the same amount Mr. Jones, in view of the length of time that was spent at it and work.

"Q. In other words, if you are not to recover attorney's fees in this case, would you make a charge of four thousand dollars to Mrs. Calhoun? A. I did not say I would do it. I think that would be a fair charge.

"Q. Well, you know that Mrs. Calhoun will get ten thousand dollars, plus several years' interest, don't you? A. I have every reason to believe she will. I think your company has given it, you have consented she may have it and I think she will get it.

"Q. All right. A. But I did not know that until very lately.

"Q. All right. I will assume that she gets her money, and I am asking you, if you do not get any attorneys' fees here from the Insurance Company, how much do you think you could justifiably charge her? A. I think I could justifiably charge four thousand dollars."

Judge Calhoun having been sworn, the following question was propounded to him:

"Q. Now Judge, taking into consideration all the facts brought out in your testimony and mine, as to the services rendered by us, considering them together, as if one lawyer had rendered all the services, what in your opinion is the fair, reasonable value of the services for attorneys, rendered by attorneys for the plaintiff in this case, both in connection with this case and the Equity case, in order to protect the rights of Mrs. Calhoun, the plaintiff herein?

"Mr. Jones: Just a minute. Defendant objects on the same ground as the objection previously made to Mr. Gentry's.

"The Court: The same ruling.

"A. Well I think we have asked for a very reasonable fee. I would estimate the services as being worth from $4200 to $5000.

"Q. And how do you arrive at your figures which you have stated? A. Well, I look upon this case as a contingent matter. That is, there would be no recovery for attorney fees unless we would succeed in this litigation, and I figure that the amount of recovery is ten thousand dollars on the policy, approximately seventeen hundred dollars interest, one thousand dollars damages, which would be $12,700, and certainly a third would be a very modest contingency fee, considering two cases. I think that ordinarily the courts would allow, where two cases were involved, a contingency fee of forty per cent, which would be five thousand dollars. A contingency fee of thirty-three and a third per cent would amount to about forty-two hundred dollars."

On cross-examination this question was propounded to witness:

"Q. Well, assume that there was no relationship between you and the insured in this case, and that you were employed by somebody, but you had no connection, no relation, and you did that work in that case on a similar policy for ten thousand dollars, how much would you charge in that case? A. Well, I think I would charge four thousand dollars."

"Mr. Wallace having been sworn, the following questions were propounded to him:

"Q. Now Mr. Wallace, assuming that all of these services were rendered as testified to by Judge Calhoun and me, in these two cases, the equity case and this present law case, what in your opinion, taking into consideration all the services and the amount involved, is the fair reasonable charge for fair attorneys' fees in these two cases?

"Mr. Boisaubin: If the Court please, we object to that question on the same ground that Mr. Jones stated with respect to the other question, similar question that was asked of the other witnesses.

"The Court: Overrule the objection.

"A. I think a third of the total recovery here is a fair and reasonable fee for the services that I understand have been rendered."

Judge Hamilton having been called by the plaintiff, testified as follows:

"Q. Now judge, taking into consideration the things that we testified, assuming our statements to be correct, what in your opinion, is a fair, reasonable charge to be made and allowed in this case to Mrs. Cal-

houn for the services rendered by her attorneys in these two cases—the equity case and this case?

"Mr. Boisaubin: If the Court please, we make the same objection to this question as we made in the previous ones.

"The Court: Yes.

"Mr. Boisaubin: For the same reasons.

"The Court: Overrule the objection.

"A. Why I think four thousand dollars, as you testified is a reasonable fee."

■ It will be observed that the only objection made by the defendant in the trial Court, when testimony as to legal services was offered, was based on the contention that there was "No evidence in this case of any vexatious refusal on the part of defendant to pay". There was no claim urged that plaintiff's pleadings were not broad enough to admit this evidence or that the evidence was irrelevant for any other reason than that set forth in the objection. The appellant is bound by the theory on which it presented its case in the trial court.

It is the general rule universally applied by appellate courts that courts of review will refuse to consider questions which have not been raised and tried in the trial court. The reasons for such ruling are numerous and varied. One is that in most instances any alleged error might have been corrected or the proper amendment made if an objection had been seasonably interposed, and that if a litigant were permitted to urge any point not going to the merits of the issue, it would give him an opportunity and an incentive to conceal errors during the trial in order that they might be used as grounds for reversal on review, in case the decision below was adverse.

In White v. Western Assurance Company, 52 Minn. 352, 54 N.W. 195, the Court said: "The cause evidently proceeded and was tried on the theory that, except for the matters alleged in the answer, the plaintiff could recover. It is a rule that generally this court will not decide a cause upon an issue of fact or law not presented to and passed on by the trial court; and that, where it is unquestionable that the party tried his cause upon one theory, either of the facts or the law, in the court below, he will not be permitted to shift his ground, so as to present an entirely different theory here. * * * The rule probably would not apply where the record shows conclusively that the party recovering is not entitled to recover; as where a complaint shows conclusively, so that it cannot be helped by proof or amendment, that there is no cause of action, or where it appears by evidence incapable of being rebutted or explained away that there is no cause of action, or that there is a defense. But to permit a party, upon an appeal, to shift his ground so as to present here a question of law, not raised in the trial court, in a case where, had it been presented there, the court might have obviated it by allowing amendments, and the introduction of further evidence might enable him to mislead the trial court and the opposite party, and so, really, to commit a fraud." See Spencer v. Black, 232 Mich. 675, 206 N.W. 493; Burroughs v. Donner, 282 Ill. 299, 118 N.E. 400; Robinson & Co. v. Belt, 187 U.S. 41, 23 S.Ct. 16, 47 L.Ed. 65; Illinois Cent. R. Co. v. Egan, 8 Cir., 203 F. 937, and 4 C.J. 701, 5 C.J.S., Appeal and Error, § 1503.

In many instances pleadings have been regarded as amended in the appellate courts to support the judgment notwithstanding an erroneous ruling against the defeated party where such a case appeared to be in the interest of substantial justice. Winston v. Terrace, 78 Wash. 146, 138 P. 673; Keller v. Webb, 126 Mass. 293.

■ In view of the rule announced and in furtherance of justice, we will regard the petition in this cause as having been amended in this Court to conform to the proof. "Let Justice prevail though the Heavens fall!"

It is urged by the appellant that the Court committed error in refusing to set aside the verdict and enter judgment for defendant on the issue of vexatious delay because "the evidence indisputably, and by documents, showed that the insured misrepresented in his application for insurance, material facts as to his prior condition of health; made false statements in said application and said misrepresentations were with respect to matters which contributed to or caused insured's death; because the evidence indisputably showed that the defendant had reasonable cause to believe that the insured was guilty of misrepresentations in obtaining the policy and that said misrepresentations were with respect to matters which contributed to insured's death; and because the evidence showed that the refusal to pay the policy was not vexatious, but was in good faith,

and that in the refusal to pay defendant had reasonable grounds to believe that there was no liability on the policy." The policy involved in this suit does not contain the sound health provision.

In the equity case of New York Life Ins. Co. v. Calhoun, 8 Cir., 97 F.2d 896, 897, this Court said:

"The application, which by the terms of the policy is a part of the contract, was made by the insured on January 24, and 25, 1934. The petition alleges that this application contained sundry false and untrue statements and representations. Most of such alleged untrue statements now appear to be immaterial under the law of Missouri, because they do not relate to matters which contributed to the death of the insured. Section 5732, R.S.Mo.1929; Mo. St.Ann. § 5732, p. 4373; Kern v. Supreme Council American Legion of Honor, 167 Mo. 471, 67 S.W. 252; Houston v. Metropolitan Life Ins. Co. [232 Mo.App. 195], 97 S.W.2d 856.

. * * *

"The determining issue in this case is whether or not the insured's answers to the questions in the application were false. Appellant and appellee differ as to whether an innocent misrepresentation will, under the law of Missouri, avoid the policy. But it is not disputed that the representation upon which a suit for rescission is based must be false in fact. See Kirk v. Metropolitan Life Ins. Co., 336 Mo. [765] 768, 81 S.W.2d 333; Kern v. Supreme Council American Legion of Honor, 167 Mo. 471, 67 S.W. 252; De Valpine v. New York Life Ins. Co. (Mo.App.), 105 S.W.2d 977; Houston v. Metropolitan Ins. Co. [232 Mo. App. 195], 97 S.W.2d 856".

It has long been the rule in Missouri that misrepresentation means an intentional perversion of the truth for the purpose of inducing another in reliance upon it, to part with something of value;—is intended to deceive another of his legal injury. State ex rel. v. Allen, 310 Mo. 378, 276 S.W. 877; Grand Lodge v. Massachusetts Bonding & Ins. Company, 324 Mo. 938, 25 S.W.2d 783; Summers v. Metropolitan Life Insurance Company, 90 Mo. App. 691. Contention denied.

The appellant also contends that the verdict was excessive inasmuch as it included interest from December 4, 1935, to the date of trial, November 18, 1938, instead of to October 19, 1938, when answer was filed admitting liability.

The answer of defendant filed in this cause on October 19, 1938, admitted liability and offered to pay the full amount of the policy of $10,000 with interest at 6% per annum from the date of the receipt of proof of death, December 4, 1935, to October 19, 1938. This offer of judgment by defendant was renewed on November 16, 1938. The offer did not include any statutory penalty. The offer was declined by plaintiff—plaintiff having elected to submit the question of damages, interest, etc. to the jury. Plaintiff had the right to decline to accept the offer of judgment. The jury found in favor of the plaintiff and computed the interest to the date upon which its verdict was returned. Plaintiff having prevailed on the question of vexatious delay she was entitled to interest to date of the verdict, therefore the contention urged last above, should be denied.

The defendant contends that the Court committed error in its refusal to give, on its behalf, instruction IV. In instruction IV, defendant requested the Court to charge the jury that if it found from the evidence that on or about December 20, 1935, the defendant was advised and informed, in writing, by Dr. J. A. Seabold, the insured's attending physician, that the insured had had a gastric hemorrhage on or about November 2, 1933, and "if you find from the evidence that the defendant had reasonable grounds to believe that on November 2, 1933, the insured was afflicted with dilated or varicose veins of the esophagus, and that the gastric hemorrhage which it was informed and advised by Dr. Seabold that the insured had had on November 2, 1933, was due to rupture of the varicose or dilated veins of the insured's esophagus, then the Court instructs you that the refusal of the defendant to pay the policy sued on herein was in good faith", and that the verdict of the jury should be limited to the amount of the policy, with interest.

Dr. Seabold was the family physician of the insured. He was somewhat confused as to what occurred on various dates. When he gave testimony by deposition some months preceding the trial of the equity case, he testified that between November 2, 1933, and the date the deposition was given he had mislaid certain records which he did not have before him at that time. Between the date of the giving of the deposition and the date of trial of the equity case, the Doctor testified that he

had found the office records which had been misplaced and from those records his memory was refreshed and he testified at the trial that vomiting of blood by Calhoun did not occur on November 2, 1933, as stated by him in his deposition, but occurred for the first time on April 25, 1934, which later date was approximately three months after the date of the application in question.

The report of Dr. Seabold to the insurance company as well as his testimony by deposition in both the equity and law case was before the court and jury and has been referred to herein.

In addition, attention of counsel for appellant is respectfully called to the findings of fact filed by the trial court in the disposition of the Equity case. The finding of the District Court on this question was against the insurance company and such finding and decree was affirmed by the Court of Appeals. Having held that the action of the Court in submitting to the jury the question of vexatious delay was proper, we feel it unnecessary to further discuss this assignment of error. The action of the trial court in declining to instruct the jury as requested in instruction IV was proper.

The trial court had before it the record in the equity case between these parties. That court had an opportunity to observe the respective witnesses and their demeanor while testifying—a privilege which is denied this Court.

The Court submitted the question of vexatious refusal to the jury. We have approved the action of that Court in this respect. The jury found the question of vexatious delay in favor of the plaintiff; in addition thereto, in a special interrogatory reading: "Did the defendant herein have reasonable grounds to believe, prior to trial of the equity suit brought by defendant to cancel said policy, that the insured had had a gastric hemorrhage on or about Nov. 2, 1933?" The answer thereto was in the negative.

A careful examination of the record in this cause including the rulings and instructions of the Court give monumental evidence that the appellant was accorded a most fair and impartial hearing by the Court nisi. That Court has placed its stamp of approval upon the findings and verdict of the jury. Finding no error we conclude that the judgment should be affirmed, and it is so ordered.