MARY E. REED, RESPONDENT, v. THE PRUDENTAL INSURANCE CO., APPELLANT.—73 S. W. (2d) 1027.

Kansas City Court of Appeals. April 30, 1934.

*Kennard & Gresham* for respondent.

*Roy P. Swanson, Ralph M. Jones, H. F. Blackwell, Ralph W. Hyatt* and *Meservey, Michaels, Blackmar, Newkirk & Eager* for appellant.

BLAND, J.—This is a suit on a contract of life insurance. There was a verdict and judgment in favor of plaintiff in the sum of $1,000, together with the sum of $170 damages and $350 attorneys' fees. Thereafter, plaintiff remitted $70 of the amount of damages allowed. Defendant has appealed.

The facts show that sometime during the summer of 1928, probably in the month of June or July of that year, one Clarence Reed, the husband of plaintiff, was solicited at his residence in Kansas City, by one Kirby Lee Smith, defendant's agent, for life insurance upon Reed's life and that an application for the insurance was there taken.

There is a dispute in the testimony as to what occurred at the time the application was signed. Plaintiff testified that her husband and Smith first talked about insurance out in the yard in her presence; that, thereafter, having agreed upon the terms and provisions of the contract, they went into the house and filled out the application; that she did not hear what was said by them in the house but before they went in she heard them say that the policy was to be in the sum of $1,000 and that it was to be made payable to her as beneficiary; that her husband gave Smith some money, but she did not see the amount thereof; that Smith handed Reed a receipt and the latter, in turn, handed it to plaintiff, saying, "Well, here is the receipt. You take care of this until we get the policy."

There is no dispute in the testimony that the application was taken and the receipt given. However, Smith, a witness for defendant, testified (by deposition) that he did not turn in the application for the reason that the money required to be paid by Reed (the first premium) was never paid to him; that he neglected to take up the receipt; that at the time it was issued Reed promised to pay the money later, but never did so; that finally it was agreed that Reed should tear up the receipt (the latter having misplaced it) and Smith would destroy the application.

The application was not produced at the trial but a blank corresponding to the one upon which the application was taken was produced and introduced in evidence. The receipt recited:

"Received from Clarence Reed (name of person applying for this insurance) the sum of Four 50/100 Dollars, being payment of first monthly premium on account of Intermediate Monthly Premium policy applied for in The Prudential Insurance Co. of America on the life of ........................

"It is understood that if this payment is equal to the full first monthly premium on said policy (but not otherwise), the insurance shall take effect from the date of the application, in accordance with the provisions of the policy applied for, provided said application is approved and accepted at the Home Office of the Company, in Newark, New Jersey, under the plan, for the premium paid and amount of insurance applied for and provided the life proposed was in sound health on the date of the application. It is further agreed that said Company will return the amount mentioned hereon if it declines to grant a policy on the above life.

"(Signed) KIRBY LEE SMITH, Agent."

"Note—Unless you receive your policy, or your money is returned within four weeks from the date of this receipt, please notify the Company, giving the name of the person to whom paid, the amount paid and the date of payment."

The application contained clauses similar to those in the receipt, except that it did not state that the company would return the premium in the event it declined to issue the policy and the "note" was not appended to the application.

No policy having been received, plaintiff representing her husband, called at defendant's Troost Avenue office along the latter part of September, 1928, and found that Smith had gone to California. She had noticed the "note" appended to the receipt but decided to give the company ample time to deliver the policy before taking up the matter with its agents.

Defendant's Troost Avenue office was composed of a superintendent, assistant superintendent, an investigator and various subordinate employees, including a cashier and solicitors. The soliciting agents' express authority was limited to soliciting insurance, taking applications and collecting "the debit" or premiums. They were furnished with receipts and blank applications. They had authority to collect the first premium and to properly fill in and sign the receipt for the same and deliver it to the persons who signed the application for insurance. They also had authority to fill out the application. They had no authority to make contracts of insurance. The assistant superintendent had express authority to supervise the work of the solicitors, inspect their accounts and it was his duty to "check up and see whether the applications have been received when inquiries are made" at the office. The assistant superintendent also had the same authority as the solicitors in regard to soliciting insurance, taking applications, collecting premiums and issuing receipts. Plaintiff had no notice of the limitation on their authority. The evidence shows that Smith was the assistant superintendent of the Troost Avenue office at the time he took the application in question; that he went to California on September 4, 1928, where he remains in the service of

defendant, but of course, he is no longer attached to the Troost Avenue office in Kansas City.

Plaintiff testified that she went to the Troost Avenue office repeatedly to inquire about the insurance; that she talked to the cashier, the superintendent, the assistant superintendent, one Moore, who the evidence shows was a "special clerk," "investigator" and "president of No. 2 office Troost Avenue," and also one Wood, another agent; that she showed them the receipt; that the superintendent told her that he thought the policy would be issued; that he could not understand why it had not been issued and that he would look after it; that "every time I went there they promised me they would issue me a policy;" that the first time she was there she was told not to pay any more premiums until the policy was issued.

The uncontradicted evidence shows that the company sent a man by the name of Wood to the house of insured on October 6, 1928, to get the receipt and issue another in place thereof, which he did. Why this was done is not explained in the evidence. On cross-examination plaintiff testified that she went to defendant's office several times before Wood called, showed them the receipt and asked why she had not heard about the insurance; that she asked why the policy had not come and they said "they would let me know what they were going to do about it;" that they did not tell her that the policy had been issued, "it was always just about the same thing. They would look it up and let me know and I would never hear from them until I would go back again." "Q. What did they say about the application? A. Well, they would just make me promises to see what they would do, and one would send me to someone else and they would send me from one manager or assistant manager to another all the time."

"Q. Weren't you also told by these various people, or Mr. Moore, in particular, when you talked to him, that the company had no record of any money having been received or any receipt having been issued to Clarence Reed? A. No.

"Q. He never told you that? A. No.

"Q. No one ever told you that the application had been approved? A. No.

"Q. Then the only reason you thought it had been approved was because they kept telling you that they would look it up? A. And promising me the policy at different times.

"Q. Awhile back you said they didn't promise to issue you a policy—

"THE COURT: Never mind about 'awhile back.'

"Q. Did they promise to issue the policy? A. Mr. Wood said when he took up that receipt that he would bring the policy."

She further testified that she was told at the office that the application had been sent to the home office; that "they had a letter from the home office in regard to the application," but she did not see it (the letter); that she and her husband had "talked about obtaining other insurance in case this policy was not issued," and she, at one time, asked Moore that the premium be returned so that insured could take out other insurance; that Moore stated that defendant company "was as good as there was, was a good responsible company. Why not let them issue the policy," and did not give the premium back. She further testified that she was not told expressly that the application had been approved but that, from her conversations with the company's agents, she arrived at the conclusion that the company had approved it; that beginning with her first visit to the office she looked after the whole matter for her husband; that the latter did not go to the office of the company at any time; that her husband was in good health at the time the application was signed and continued in good health until about six months before he died, which event occurred on July 27, 1930; that when Wood called for the receipt he told plaintiff that he would send it to the home office; that he gave her another just like it except it was dated October 6, 1928, and was signed by Fred M. Wood, agent, instead of Kirby Lee Smith, agent.

After insured died and plaintiff had placed the claim against defendant in the hands of attorneys, Moore came out to see her and said he wanted to give her a check. She did not look at the check but referred him to her attorneys. After the death of her husband she talked to Mr. Metcalf, superintendent, and he promised her that the company would make a settlement; that he would let her know in a few days.

Moore testified that he was employed directly by the home office and worked under the local superintendent "on special cases;" that after the death of insured he was directed by the superintendent, upon instructions from the home office, to see plaintiff and pay the face of the receipt and take it up; that he went to the house and plaintiff said she could not produce the receipt because it was in the hands of her attorneys; that he offered to pay her the face amount of whatever the receipt called for. He further testified that prior to the death of insured, when plaintiff was in defendant's office and wanted the money returned that she had paid, she showed him a receipt given by Wood for $4.50; that he then went through the records of the office but failed to find where any application had been turned in, or where there had been any receipt for $4.50 upon the application. Plaintiff testified that no one told her at any time that there was no record in the office concerning the application and receipt. Moore further testified that when an application was taken and the first

premium collected by the soliciting agent, the usual routine would be that the application was delivered to the office of the superintendent in charge of the district in which the solicitor was employed; that a record of the application would there be made and it would then be sent to the home office for approval or disapproval.

Moore admitted that he did not get in touch with Smith to find out what had become of the application, stating, that Smith before he left for California had told the witness that he had destroyed the application. However, it appears that Smith left before plaintiff's first visit to the office of the defendant and, therefore, before any complaint had been made by plaintiff. He further testified that Smith could not have turned in the application through the California office because it had to be turned in from the office in the city where it was taken. However, the assistant divisional manager of the home office testified (by deposition) that there are rare instances where the application might be sent by the soliciting agent direct to the home office. This witness testified that he had the records at the home office of the company, relative to its Kansas City business, searched and did not find any record of any application having been received or acted upon from the insured. No search was made of the records relating to the California business of the company and what search was made was not made by the witness and there is no reason disclosed in the evidence as to why the deposition of the person who actually made the search could not have been taken.

Wood testified that he was sent out from the office to interview plaintiff about the insurance; that he did not remember what the occasion was for his going out, but when shown the receipt he testified that he gave it to plaintiff at the time and if he did take up the old receipt given by Smith, under the practise it would have been turned into the office.

It is insisted by defendant that its instruction in the nature of a demurrer to the evidence should have been given for the reason that the petition and the main instruction of plaintiff bases her right of recovery upon estoppel and a contract of insurance may not be created by estoppel. It is true that estoppel does not, in itself, give right to a cause of action. [Mitchell v. Am. Mut. Assn., 46 S. W. (2d) 231, 237.] However, there is no question but that under some circumstances an insurance company may be estopped from asserting that it did not approve or accept an application for insurance. [32 C. J., p. 1106; Ins. Co. v. Stone, 61 Kan. 48; Williams v. Ins. Co., 102 Kan. 74; 1 Joyce on Ins. (2nd Ed.), pp. 243, 244; 1 Cooley's Briefs on Ins., p. 596 (2nd Ed.); Sadie Richmond v. Travelers Ins. Co., 30 L. R. A. (N. S.), pp. 954, 956; Great So. Life Ins. Co. v. Dolan (Tex.), 239 S. W. 236; Beswick v. Casualty Co., 206 Mo. App. 67; Rhodus v. Ins. Co., 156 Mo. App. 281.]

The question to be decided is whether there are sufficient facts disclosed in the record, which, if found by the jury, would give rise to estoppel on the part of defendant to say that it did not approve or accept the application. Of course, where the contract provides that the insurance shall be in force upon the approval of the application, there is a completed contract upon such approval without the issuance of a policy. [Cooley's Briefs on Ins. (2nd Ed.), p. 601; Pickett v. Equitable Life Assur. Soc., 27 S. W. (2d) 452.] It is true, as claimed by defendant, that the general rule is that mere delay in passing upon an application for insurance is not sufficient, within itself, upon which to base estoppel, even though the premium is retained. [32 C. J., p. 1106; Misselhorn v. Mut. Res. Fund Life Assn., 30 Fed. 545; Ins. Co. v. Johnson, 23 Pa. 72; Indiana Life Ins. Co. v. Maines (Ky.), 230 S. W. 54.

"Silence operates as an assent, and creates an estoppel, only when it has the effect to mislead. There must be such conduct on the part of the insurer as would, if it were not estopped, operate as a fraud on the party who has taken, or neglected to take, some action to his own prejudice in reliance upon it." [Cooley's Briefs on Ins. (2nd Ed.), p. 596.]

"There are cases to the effect that delay will hold the company where the party making the application has been misled into believing that the insurance would be accepted, and relying thereon, has refrained from obtaining other insurance. Here, it is observed, arises the element of injury and the consequent estoppel." [Richmond v. Travelers' Ins. Co., 30 L. R. A. (N. S.), pp. 954, 956.]

"The company may be estopped to deny an acceptance of an application where the applicant was led to believe and did believe, that it had been accepted." [32 C. J., p. 1106.]

Much depends upon the authority of those in charge of defendant's Troost Avenue office in making statements relative to the insurance as to whether the facts in this case are sufficient to support a claim of estoppel. While it may be (we do not say) that these persons were not such agents as those who have the power to make contracts of insurance, or waive or modify any of the conditions or terms thereof (of course, they had no express authority to do those things), nevertheless there is no question but that, being the local representatives of defendant in charge of its office, they had authority to impart information to the insured or his agent, relative to the matter of his application for insurance. [Ins. Co. v. Stone, 61 Kan. 48, 54, 55.] In this connection it will be remembered that the assistant superintendent had express authority "to check up and see whether the applications have been received *when inquiries are made.*" He, therefore, had express authority to receive inquiries. From statements made of the character mentioned, it was within the province of the

jury to find that the application had been forwarded to the home office and that it had written a letter in reference to the same, because such information was imparted to plaintiff. The statement of the superintendent that he could not understand why the policy had not been received shows that he understood that the application had been sent to the home office. In fact there is very little, if any, evidence tending to show that the application was not received at the home office.

Defendant insists that the premium was never received at the home office but the evidence shows that Smith had authority to take the application and collect the premium, consequently, his receipt of the premium and the application was that of the company, as though they had been received directly at the home office, even though he never had communicated the fact that he had received them to that office. [Natl. Hotel Co. v. Merchants' Fire A. Corp., 183 Ill. App. 71; Mut. Life Ins. Co. v. Abbey, 76 Ark. 328; Mannheim Ins. Co. v. Chipman, 124 Fed. 950; Robinson v. U. S. Bene. Soc., 132 Mich. 695, 699; New York Union Mutl. v. Johnson, supra.]

On account of the apparent conflict between plaintiff's testimony on direct and cross-examination, there is some question as to whether plaintiff was told by those in charge of defendant's Troost Avenue office, *when she called there*, as to whether the policy would be issued or, merely, that the delay was due to the fact that the company had not made up its mind as to what it intended to do. However, she does testify that Wood told her when he called at her house to take up the receipt that Smith had given her, that *he would bring the policy*, inferring that the application had been approved.

It may well be commented upon, here, that there is no explanation as to why this receipt was taken up and another given in its place by the defendant. It is possible that it wanted to get the original receipt in order to investigate the matter, but it appears that it did not communicate with Smith, who knew all about the circumstances surrounding the issuance of the receipt. Neither was plaintiff advised that an investigation had been made and it was found that there was no record of any application. On the other hand she was told that the application had been sent in and that she should wait, leading her to believe that the insurance would be consummated. The fact that defendant sent Wood to take up the receipt was evidence that it knew that an application for insurance had probably been taken upon the life of Reed by Smith. Yet, there is no evidence of any investigation having been made of the matter outside of the records of the local and home offices, and the testimony of the searcher at the home office was not produced. Another circumstance that is worthy of comment is that there were other persons connected with the Troost Avenue office of defendant, aside from Moore, Smith and

Woods, who dealt with plaintiff, yet, defendant did not produce the testimony of any of these others.

Taking plaintiff's testimony, as a whole, it would seem that the jury could arrive at the conclusion that information was imparted to her which was calculated to cause her to believe, and she did believe, that if the application had not been approved in fact, and that it was only the matter of the issuance of the policy that held up the consummation of the whole transaction, at least there was no question but that the insurance would be consummated without informing her of just what was holding up the matter. Moore told her when she told him that she wanted her money back so that she and her husband would know that defendant was not going to issue the policy thus allowing them to obtain it in another company that the defendant company was a good company and she should allow it to issue the policy, leading her to believe that the company had decided to issue it. She relied upon the information imparted to her and waited for months and until, finally, her husband became ill and could not obtain insurance elsewhere. Defendant comments upon the fact that insured obtained a $300 accident policy elsewhere but we place no importance on this fact. There is no explanation given in the record, nor does any occur to us, why the company could not make up its mind, over a period of nearly two years, whether it wanted to issue the policy in question. Defendant's agents were informed by plaintiff that if it did not desire to issue the policy that insured wanted to take a policy in some other company. Yet, knowing that insured desired insurance of this character and amount, it still put plaintiff off with hopeful and encouraging information tending to cause her to believe that the insurance would finally be consummated and preventing her from procuring such insurance elsewhere. We have no doubt but that there are sufficient facts disclosed in the record to create a basis for estoppel against defendant to deny that it approved the application.

Plaintiff testified that she did not know that the $4.50 was to be a monthly premium, but thought the premium of $1 was to be paid weekly after the policy was issued; that she thought that the $4.50, paid at the time the receipt was given and the application taken, was not for insurance for a month but only until the policy was received. From this testimony defendant says that there was no meeting of minds and, therefore, no contract. It makes no difference what plaintiff thought about this matter. The evidence shows that she was constituted insured's agent for the purpose of interviewing the representatives of defendant in reference to the delayed approval of the application and the issuance of the policy. The evidence shows that so far as making the contract, itself, is concerned, this was done on behalf of the insured by himself, personally, and the receipt and ap-

plication shows that $4.50 was to be the monthly premium. In view of the fact that the agreement was in writing and provided for a monthly premium of $4.50 it would seem to be immaterial what one of the parties thought about it, in any event. [Richmond v. Travelers' Ins. Co., supra, l. c. 956.]

It is insisted that the demurrer should have been sustained for the reason that the alleged contract would have expired long prior to the death of insured on account of the fact that only one month's premium was paid. The answer did not set up any affirmative defense based upon the failure to pay the premiums. There is nothing in the evidence to show that had the insurance been consummated in the usual way that the policy would have provided for a forfeiture of the insurance for the nonpayment of premiums, or that the covenant of the company to pay the loss and that of the insured to pay the premiums, would have been dependent. It is, therefore, unnecessary for us to say what would have been the effect had any such provision of the policy been pleaded or shown in evidence (on this point see Baile v. Ins. Co., 73 Mo. 371), and likewise, what effect should be given the statements of the defendant's agents, that no further premiums would be payable until the policy should be received.

It is also contended that there is no showing that there was an agreement between insured and Smith that plaintiff was to be the beneficiary. While, it is true that plaintiff testified that she did not see the application and she did not know whether her name was mentioned in it as the beneficiary, we construe her testimony to mean that the terms of the application were discussed and agreed upon out in the yard in her presence and that nothing was left but the drawing up of the application and that it was only for this purpose that her husband and Smith went into the house. We think that the jury could well infer from these circumstances that she was made beneficiary in the application. In this connection it is difficult to understand why defendant tendered back the premium to plaintiff except on the theory that she was the party entitled to sue upon the contract, that is to say, the beneficiary. We say this regardless as to whether, technically, the tender should have been made to her, even if she was the beneficiary. The mere possession by her of the receipt would not entitle her to the money.

It is claimed that there is no evidence that insured was led to believe that the application had been approved and was thereby caused to refrain from obtaining the insurance elsewhere. What we have said disposes of this contention.

It is claimed that the court erred in permitting plaintiff, over the objection of defendant, to testify that she believed the company had approved the application. There is no merit in this contention, in view of the fact that her belief, as her husband's agent was an issue

in the case. [32 C. J., p. 1106, par. 195; Murphy v. Elec. Park Amusement Co., 209 Mo. App. 638.]

It is insisted that the court erred in refusing to strike out the statement of plaintiff that "You are insured until you receive the policy, that is what the receipt states." The court refused to strike this testimony out because it was elicited by the defendant, itself. In this respect the court did not commit error.

It is insisted that the court erred in refusing to allow defendant to show that the agent would have received a commission of $27, if he had turned in the premium to defendant and a policy had been issued. However, we find that the defendant, later, elicited the same information and, in no event was the error, if any, material under the circumstances.

It is insisted that the verdict fails to give defendant credit for the amount of the premiums that had accrued upon the policy at the time of the death of insured, which were not paid. We think this contention must be sustained. [Keeton v. National Union, 182 S. W. 798.] This will require a *remittitur* of $198 from the amount of the judgment.

It is urged that there is no basis for the allowance of the statutory penalty and attorneys' fees in this case, as no policy was issued and there is no evidence of vexatious refusal to pay. The fact that no policy was issued does not make inapplicable the statute allowing the penalty for vexatious refusal to pay and attorneys' fees. [State ex rel. v. Bond & Surety Co., 279 Mo. 535, 553.] However, it is contended that there was no demand for the payment of the insurance prior to the bringing of the suit. It is well settled that no demand is necessary when the company denies all liability. [Liebel v. Met. Life Ins. Co., 241 S. W. 647.]

After insured's death defendant's superintendent promised to let plaintiff know in a few days whether the company would make a settlement with her. Her attorneys took up the matter with both the home office and its office in Kansas City and received a letter from the latter office, stating that the matter had been referred to the company's legal department. There is no evidence that any reason was ever assigned as to why the insurance was not paid.

Defendant says that it had a right to rely upon its witnesses who testified that no premium was received and "also to litigate this case on the proposition that it was not estopped from asserting a complete defense." There is no evidence that it was relying upon any such defenses when it refused to pay. [See Buffalo Ins. Co. v. Bommarito, 70 A. L. R., p. 1211; 42 Fed. (2d) 53.] The fact that defendant tendered back the premium is an admission that it was received. [Scofield v. Am. Mut. Ins. Co., 52 S. W. (2d) 205; Wells v. Elec. Co., 108 Mo. App. 607.] The receipt, itself, which defendant ad-

mittedly knew was in plaintiff's hands, was evidence that it had been paid. [32 C. J., p. 1204.]

It has been held that the refusal to pay insurance without giving a reason constitutes evidence of vexatiousness (Jabin v. Natl. Acc., 41 S. W. (2d) 874), and that changing the ground for refusal after suit has been filed, is also such evidence. [Fay v. Aetna Life Ins. Co., 268 Mo. 373.] In this case there was no ground whatever assigned for the refusal to pay. We think, therefore, there was evidence from which the jury could assess the ten per cent penalty and attorneys' fees.

If plaintiff, within ten days, will remit the sum of $108 from the face of the judgment, the judgment will be affirmed. Otherwise, the judgment will be reversed and the cause remanded. All concur.