Henry Dale OVERCAST, Respondent,

v.

**BILLINGS MUTUAL INSURANCE COMPANY, Appellant.**

No. SC 81741.

Supreme Court of Missouri,
En Banc.

Feb. 8, 2000.

Rehearing Denied March 7, 2000.

Robert D. Lewis, Dale L. Davis, Springfield, for appellant.

Michael T. Pivac, Thomas H. Hearne, Springfield, for respondent.

John G. Schultz, John L. Mullen, Shawn G. Foster, Kansas City, Robert M. N. Palmer, Springfield, Bryan E. Nickell, Sikeston, Robyn G. Fox, St. Louis, for amicus curiae.

MICHAEL A. WOLFF, Judge.

When Henry Dale Overcast's home was destroyed by fire in 1997, his insurance company, Billings Mutual Insurance, refused payment on the grounds that the "loss resulted from an intentional act" committed either by Overcast or at his direction. Overcast sued for insurance benefits under the policy and for defamation. The trial court entered judgment, after jury verdict, for contract damages for the insurance coverage and for actual and punitive damages on the tort claim for defamation. On appeal, the insurance company renewed its main contentions: (1) that Overcast's sole remedy against the company is for breach of contract because the statute, section 375.420,[1] which provides enhanced recovery for an insurance company's vexatious refusal to pay, preempts all other claims; and (2) that the insurance company is not liable for defamationbecause the statement that Overcast was an arsonist was not published to third parties, did not cause damage, was consented to by Overcast, and was a privileged communication. This Court granted transfer after opinion by the court of appeals. Mo. Const. art. V, section 10. We affirm the judgment of the trial court.

## FACTS[2]

Overcast purchased a fire policy from the insurance company in August 1996, insuring his home up to $50,000 and its contents up to $15,000. On the morning of April 1, 1997, Overcast discovered smoke in his house. When he passed the bathroom door, he could feel heat. He opened the door and was momentarily overcome by heat and smoke. He ran from the house and shouted for his neighbor. Overcast and his neighbor tried to put out the fire by grabbing a garden hose and entering the house, while the neighbor's wife called the fire department. Overcast and his neighbor fought the fire for several minutes until the neighbor insisted they leave. Both the house and its contents were destroyed.

Gayle Cobb, the general manager of Billings Mutual Insurance Company and sole claims decision maker, conducted the company's investigation, in part by hiring Jim Kuticka of Wickizer–Clutter Insurance Claims Adjusters to investigate the cause of the fire. Cobb testified that he had previously hired Kuticka about 25 times to investigate fires and was familiar with the thoroughness and quality of his work. Cobb knew that Kuticka would only do a visual inspection of debris and carpet in Overcast's home, unless directed to do more. Kuticka raked away the debris, which had baked, and from a visual inspection of the burns on the carpet, Kuticka determined that "large amounts of flammable liquid had been poured throughout the house." Cobb did not direct Kuticka to test for the presence of flammable liquids. Cobb knew that Kuticka had neither reviewed the fire department's report nor spoken to any firefighter before concluding that the fire was intentionally set. Kuticka's report, as well, did not mention the involvement of a neighbor. Although Kuticka's investigation was not thorough, Cobb accepted the report and denied the claim. Before Cobb told Overcast he was denying the claim on account of arson,

1. All references are to RSMo 1994 unless otherwise indicated.

2. There is little disagreement as to the basic facts of this case, though the parties differ on interpretation. With deference to the jury's role, the facts are stated favorably to the verdict.

Cobb told Overcast that he could clear away the property. Cobb did not inform Overcast that he could have a separate and independent investigation on the property by the state fire marshal. Kuticka and Cobb agreed not to talk to any firefighters until after the debris had been cleared and after the decision was announced denying the claim.

Investigator Kuticka acknowledged that, when the presence of an ignitable liquid is suspected, the "better practice is to further test for the presence of accelerants by use of chromatograph or mass spectrometry." No such tests were conducted. Cobb in the past had instructed Kuticka to conduct these tests, but not for Overcast's fire. Kuticka did, however, tell Cobb that he did not smell any chemicals when he entered the house, nor did he find any chemicals on a terry cloth rag he removed from the scene. This was consistent with the neighbor's testimony at trial that the neighbor did not smell chemicals on Overcast or in the house. Moreover, the neighbor corroborated Overcast's testimony that the fire was coming from the bathroom and not from the carpeted living room floor.

Kuticka testified that different investigators looking at the same burn patterns can reach different conclusions as to the cause of the fire. Kuticka also acknowledged that, in at least four different investigations, he had concluded that the fire had been intentionally set while the state fire marshal's office had determined each of the same fires to be the result of an accidental electrical cause. Cobb did not seek a second opinion about the cause of the fire or the burn patterns. Since the debris and property had been cleared away, Overcast was not able to challenge the insurance investigation, after the claim was denied, because there was nothing left to inspect.

Except for Kuticka's testimony as to the burn patterns, there were no "red flags of fraud or red flags for arson." These "red flags," which indicate reason to suspect arson, include, for example: more than one mortgage, late payments, divorce, prior claims, multiple claims, problems affecting title to the property, over-insurance, an increase in insurance coverage right before the claim, recent cancellations of other companies, liens, threats of foreclosure on the property, lawsuits, and recent job transfers. After this investigation, Cobb sent Overcast a letter denying his claim for coverage, stating: "the loss resulted from an intentional act committed by you or at your direction." Cobb testified that the letter was addressed solely to Overcast and sent by registered mail, return receipt requested. He did so, Cobb said, to avoid "publishing" the arson charge to other persons.

Cobb testified that he knew the contents of the letter would affect Overcast's ability to obtain insurance policies from other companies. Overcast attempted to get an insurance policy for his farm buildings through All Risk Insurance Agency in Springfield, Missouri. The agent asked Overcast if he had a claim that had ever been denied. After Overcast showed the Cobb letter to the agent, the agent told Overcast that she would not be able to issue a policy. Overcast attempted to get insurance from other companies, but was asked the same question as to the reason for the denial of the claim. He was unable to get coverage.

## THE TRIAL COURT'S JUDGMENT AND THIS APPEAL

Overcast pleaded three counts against Billings Mutual, seeking: (1) damages for breach of contract; (2) penalties and attorneys' fees under the vexatious refusal to pay statute; and (3) actual and punitive damages for defamation. The trial court granted summary judgment to Billings Mutual on Overcast's second count under the vexatious refusal to pay statute, section 375.420, because section 380.511 provides that mutual insurance companies are not covered by section 375.420. No appeal is taken as to that ruling.

On Overcast's claim for breach of contract, the trial court entered judgment for $26,990 damages plus $2,429 interest. Billings Mutual paid the judgment on that count, and there is no appeal on the contract claim.

On Overcast's claim for defamation, the jury returned a verdict of $500,000 actual damages and found Billings Mutual liable for punitive damages. In the trial's second phase, on the assessment of punitive damages, the jury returned a verdict of $400,000 punitive damages. The trial court's judgment included these sums.

Billings Mutual's points on appeal relate only to the defamation judgment. The points are summarized as follows:

(1) The vexatious refusal to pay statute preempts Overcast's defamation claim;

(2) Overcast cannot recover for defamation because:

(a) There was no publication to third parties;

(b) The denial of coverage, not the defamatory statement, caused Overcast to be deprived of insurance coverage;

(c) There is an absolute privilege for the insurance company to communicate the reasons for its denial to its insured;

(d) Overcast consented to the communication; and

(e) Billings Mutual was entitled to jury instructions on its defense of "opinion and belief," the asserted consent privilege, and its defense

that the company believed the statement to be true.

These contentions are addressed in order.

**(1) The Vexatious Refusal Statute Does Not Preempt Overcast's Defamation Claim**

■ The insurance company's major contention on appeal is that Missouri's vexatious refusal to pay statute, section 375.420, preempts and excludes other remedies that the insured may have against his insurance company. However, the language of the statute does not purport to preempt the common law breach of contract remedy but only to add to that remedy. Nor is there any such preemptive intent discernable from the context of the statute. Section 375.420, titled, "Vexatious Refusal, To Pay Claim Damages For, Exception," provides:

> In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.[3]

**3.** There are two vexatious refusal to pay statutes, 375.420 and 375.296. Section 375.296, titled, "Additional Damages For Vexatious Refusal To Pay," provides:

> In any action, suit or other proceeding instituted against any insurance company, association or other insurer upon any contract of insurance issued or delivered in this state to a resident of this state, or to a corporation incorporated in or authorized to do business in this state, if the insurer

has failed or refused for a period of thirty days after due demand therefor prior to the institution of the action, suit or proceeding, to make payment under and in accordance with the terms and provisions of the contract of insurance, and it shall appear from the evidence that the refusal was vexatious and without reasonable cause, the court or jury may, in addition to the amount due under the provisions of the contract of insurance and interest thereon, allow the

When an insurance company wrongfully refuses payment of a claim to its insured, the company has simply breached its contract. Damages for breach of contract are limited to the loss of the benefit itself. The damage amount should place the insured in the position he would have been in had the contract been performed. *See Boten v. Brecklein,* 452 S.W.2d 86 (Mo.1970).

The problem with the breach of contract as a sole remedy, which section 375.420 addresses in some situations, is that an insured who is wrongfully refused payment is not compensated for litigation expenses and, thus, is not made whole in a practical sense by an action in which he only recovers consequential damages flowing from the breach. The statute does not touch the basic contract claim and only reaches situations where the refusal to pay is "without reasonable cause or excuse." The statute's provisions of attorneys' fees and the ten to 20 percent penalty obviously aim to make the contracting party whole in a practical sense and to provide an incentive for insurance companies to pay legitimate claims without litigation.

No tort claim has supplanted or supplemented the basic contract claim and remedy where an insurance company wrongfully refuses to pay a loss incurred by its own insured. For instance, in *Catron v. Columbia Mutual Ins. Co.,* 723 S.W.2d 5 (Mo. banc 1987), this Court refused to allow a *prima facie* tort claim by an insured against the insurer.[4] The courts of this state, however, have recognized an insured person's tort claim against the person's own insurance company for bad faith refusal to pay a party injured by the person insured, a refusal that exposes the insured to liability in excess of the policy's limit. This Court first recognized such a tort claim in *Zumwalt v. Utilities Ins. Co.,* 360 Mo. 362, 228 S.W.2d 750 (1950). *See also Ganaway v. Shelter Mutual Insurance Co.,* 795 S.W.2d 554 (Mo.App.1990), and Anthony G. Fussner, Comment, *Overview of Bad Faith Litigation in Missouri,* 62 Mo. L. REV. 807 (1997). In such cases, the insurance company is held to a duty to act in good faith to protect the interests of its insured, separate from a simple obligation to pay the insured a benefit under the contract. The

plaintiff damages for vexatious refusal to pay and attorney's fees as provided in section 375.420. Failure of an insurer to appear and defend any action, suit or other proceeding shall be deemed prima facie evidence that its failure to make payment was vexatious without reasonable cause.

The insurance company refers to 375.296 in a point relied on, but does not discuss it in its brief. The difference between the two statutes appears to be that section 375.296 applies even when the insurance company "delays" payment under a policy. There is some authority that a former version of section 375.296, then section 375.168, applies only to insurance companies not incorporated or authorized under the laws of the state. *See Willis v. American Nat. Life Ins. Co.* 287 S.W.2d 98 (Mo.App.1956), and *Rife v. State Farm Mutual Insurance Co.,* 833 S.W.2d 42, 44 (Mo.App.1992). *See also* Anthony G. Fussner, Comment, *Overview of Bad Faith Litigation in Missouri,* 62 Mo. L. REV. 807, 810 (1997). This issue is not before the Court and the parties appear to agree that section 375.420, quoted in the text, applies to this case. The titles to the two sections are quot-

ed, though they are not part of the law (H.B. 93, 78th General Assembly, 1975 and H.B. 262, 74th General Assembly, 1967). The titles impart the common term "vexatious refusal to pay" by which these sections are known. It may be noteworthy that section 375.420, which was last revised in 1975 (*Laws,* 1975, H.B. No. 93, p. 369, section 1), dropped the word "vexatious" from the section in favor of the phrase "without reasonable cause or excuse."

4. The *prima facie* tort claim may be the tort of last resort or the last refuge of those who have no claim, depending on one's point of view. The tort was first expounded in this state in a scholarly opinion in *Porter v. Crawford Co. et al,* 611 S.W.2d 265 (Mo.App.1980). One of the elements of the tort is that the defendant committed a lawful act, but with a malevolent intent. It is difficult to find reported cases where a plaintiff actually has recovered on a *prima facie* tort theory. *See Brown v. Missouri Pacific Railroad Co.,* 720 S.W.2d 357, 361–362 (Mo. banc 1986). *See also Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 315–316 (Mo. banc 1993).

insurance company incurs liability exposure in such "bad faith" claims when the company refuses to settle a claim within the policy limits and the insured is subjected to a judgment in excess of the policy limits as a result of the company's bad faith in disregarding the interests of its insured in hopes of escaping its responsibility under the liability policy. 228 S.W.2d at 754. While an insurance contract is the basis for the relationship between the insurer and its insured, "bad faith" liability in handling third-party claims is premised on tort concepts and the extent of the damages is not confined to the liability amount stated in the policy. *Id.*

■ Here, however, there is no representation by the insurance company as to claims by third parties. The claim here is by the insured against the insurance company for the policy benefit; the insured's remedy is limited to that provided by the law of contract plus, if section 375.420 applies, the enhancements provided by the statute. *See Zumwalt,* 228 S.W.2d at 756.

Overcast's tort claim for defamation is not dependent on the elements of the contract claim. Indeed it would be possible for the insurance company to defame Overcast even in a situation where it had decided to pay his claim.[5] Thus, Overcast's defamation claim is not based on the company's refusal to pay and is based on conduct quite distinct from conduct that

merely constituted a breach of contract.[6] We cannot infer that the legislature intended, by providing the vexatious refusal to pay remedies in section 375.420, to immunize insurers against all other claims made by an insured for any conduct occurring during a claim determination.

To support its contention that section 375.420 preempts Overcast's defamation claim, the insurance company cites four court of appeals decisions that decline to extend the "bad faith tort" to actions by an insured against his own insurer—commonly called "first party" claims. *See Duncan v. Andrew County Mutual Insurance Company,* 665 S.W.2d 13 (Mo.App.1983); *Halford v. American Preferred Insurance,* 698 S.W.2d 40 (Mo.App.1985); *Meeker v. Shelter Mutual Insurance Co.,* 766 S.W.2d 733 (Mo.App.1989); and *Shafer v. Automobile Club Inter–Insurance Exchange,* 778 S.W.2d 395 (Mo.App.1989). Without much analysis, these court of appeals cases cite section 375.420 as "preempting" the bad faith tort claim. The lengthiest discussion is found in *Duncan v. Andrew Co. Mutual Ins. Co.,* which refers to section 375.420 as "the linchpin for subscribing to the theory of preemption" and states: "It is a clear expression of public policy on the subject vitiating any need for extending the tort of bad faith to first party claims." 665 S.W.2d at 20.

■ As Overcast notes, however, the appellate court decisions have not articu-

---

**5.** For instance, the insurance company could announce that it believed its insured was an arsonist, but was going to pay the claim simply to avoid the expense of litigation.

**6.** The denial of coverage is not part of Overcast's defamation claim. As submitted to the jury, the verdict-directing MAI-based instructions read:

INSTRUCTION NO. *12*
Your verdict must be for plaintiff if you believe:
First, defendant wrote the statement "the loss resulted from an intentional act committed by you or at your direction," and
Second, such statement was false, and
Third, defendant wrote the statement either:

with knowledge that it was false, or with reckless disregard for whether it was true or false at a time when defendant had serious doubt as to whether it was true, and
Fourth, such statement tended to deprive plaintiff of the benefit of other insurance contracts after July 1, 1997, and
Fifth, such statement was read by Linda Kimball, and
Sixth, plaintiff's reputation was thereby damaged.
Unless you believe plaintiff is not entitled to recover by reason of Instruction No. *13*.
INSTRUCTION NO. *13*
Your verdict must be for defendant on plaintiff's claim of defamation if you believe that the statements as contained in defendant's denial letter were true.

lated a distinct test for determining whether section 375.420 preempts a particular common law tort claim. The four court of appeals decisions—*Duncan, Halford, Meeker,* and *Shafer*—correctly hold that an insurance company's denial of coverage itself is actionable only as a breach of contract and, where appropriate, a claim for vexatious refusal to pay. In *Halford, supra,* 698 S.W.2d 40, the court of appeals does not go beyond the narrow decision to say that all torts, whether from the claim denial itself or related conduct, are barred by section 375.420. The plaintiff's slander claim was pending in the circuit court and was not part of the appeal. In considering whether the slander claim should have been included in the judgment, for purposes of finality, the court noted that the slander claim, which shares none of the elements of the contract claim, "is only tangentially related to the handling of the insurance claim." 698 S.W.2d at 42. *Meeker* and *Shafer,* which do not involve slander, each reject an attempt to state "a 'tort-based remedy' for breach of contract." *Shafer,* 778 S.W.2d at 400. These decisions all reject converting a breach of contract into a tort, as does our decision in *Catron, supra,* 723 S.W.2d at 5. In reviewing these decisions it seems doctrinally more correct to follow the teachings of the common law as to torts and contracts than to fashion an ill-fitting preemption theory.

Traditional principles of statutory construction will suffice; thus, it is neither desirable nor necessary to articulate or develop a new test for preemption. Where the legislature intends to preempt a common law claim, it must do so clearly. A statute is not invalid if it conflicts with the common law, section 1.010. But statutes displacing common law remedies are to be strictly construed, *Perry v. Strawbridge,* 209 Mo. 621, 108 S.W. 641 (1908), and if the question is close, the balance should be struck in favor of retaining the common law remedy. *Lastra v. Intercontinental Investments Co., Inc.,* 745 S.W.2d 703, 708 (Mo.App.1987) (quoting *Huff v.*

*Union Electric Co.,* 598 S.W.2d 503, 511 (Mo.App.1980)). The legislature's preemption of a common law claim is done clearly, for example, in workers' compensation cases where the statute simply says that "the rights and remedies herein granted to an employee shall exclude all other rights and remedies . . . at common law or otherwise. . . ." Section 287.120. Similarly the legislature writes plainly when granting tort immunity to insurance companies when they cancel coverage: section 375.006 in that instance provides, in pertinent part, "there shall be no liability . . . against any insurer . . . as to reasons for cancellation or non-renewal, for any statement made . . . in any written notice of cancellation or non-renewal, or in any other communication, oral or written, specifying the reasons for cancellation or non-renewal. . . ."

By contrast, section 375.420 does not displace or preempt any remedies nor does it provide an immunity from liability. As noted, this section leaves in place the common law contract remedy. But in circumstances where the refusal is "vexatious," the basic contract remedy is enhanced. Where the refusal is not "vexatious" but is nonetheless wrongful, only contract damages can be recovered.

There is not one word in the statute to support the notion that section 375.420 "preempts" any claim. The appeals court in *Duncan v. Andrew County Mutual,* 665 S.W.2d 13, 20, refers to the "public policy" of section 375.420. However, the law's words are preferable to inferences about policy. As the workers' compensation section and the cancellation immunity provision, cited above, demonstrate, the general assembly by the words it uses is perfectly capable of preempting a common law remedy or granting immunity. There is no need for courts to infer a preemption or immunity where the legislature does not say so. To read words and concepts into our statutes that the general assembly did not write shows disrespect both for the general assembly and for the common law,

which the legislature has the power expressly to displace.

In this case, Billings Mutual, the insurance company, asks us to adopt and to expand on the preemption analysis in *Duncan v. Andrew County Mutual*, 665 S.W.2d at 20, and to hold that section 375.420 preempts the defamation tort claim even though the statute does not apply to mutual insurance companies such as Billings under section 380.511. Thus we are asked to read words of preemption into a statute that are not there, and then to apply them to companies that are not covered by the statute. Stripped to these essentials, the company's position is self-refuting. More importantly, the claim for defamation is not based on any of the elements of Overcast's contract claims.

## (2) Overcast's Defamation Claim

 Billings Mutual makes several challenges to the viability of Overcast's claim for defamation and to the correctness of instructions under which the claim was submitted to the jury. The elements of defamation in Missouri are: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo. banc 1993).

 The requisite degree of fault for a private figure, like Overcast, is negligence, but to recover punitive damages, Overcast must prove malice. *Englezos v. Newspress and Gazette Co.*, 980 S.W.2d 25 (Mo.App.1998). "Actual malice" is defined as a false statement made "with knowledge that it was false, or with reckless disregard for whether it was true or false at a time when defendant had serious doubt as to whether it was true." *Snodgrass v. Headco Industries, Inc.*, 640 S.W.2d 147 (Mo.App.1982); *Nazeri v. Missouri Valley College, supra*, 860 S.W.2d 303.

We conclude that Overcast's claim for defamation was valid and was supported

by the evidence. The trial court's instructions, based on MAI, were proper.

### (a) Was There A Publication?

 Billings Mutual contends that because the letter was addressed registered mail, return receipt requested, deliver to addressee Overcast only, there was no publication; thus, Overcast was not defamed.

 Under Missouri case law, there was sufficient evidence of publication to support the jury's verdict. Communication of defamatory matter only to the plaintiff who then discloses it to third parties ordinarily does not subject defendant to liability. *Herberholt v. dePaul Community Health Center*, 625 S.W.2d 617 (Mo. 1981), citing *Ramacciotti v. Zinn*, 550 S.W.2d 217, 223 (Mo.App.1977). However, an exception, which applies here, is recognized by this Court where "the utterer of the defamatory matter intends, or has reason to suppose, that in the ordinary course of events the matter will come to the knowledge of some third person." *Herberholt*, 625 S.W.2d at 624–625. There was testimony that Cobb was concerned that he would be sued for defamation. His sending the letter registered mail, return receipt requested, deliver to addressee only, was his unsuccessful attempt to avoid a publication to third parties. There was testimony by agents from other insurance companies that insurance applications ask if the applicant had ever had a claim denied and the reasons for the denial. The evidence was sufficient to show that in the ordinary course of business, Cobb was aware that the allegation that Overcast was an arsonist would need to be published and would be published to third parties.

### (b) There Was Evidence That Overcast Was Damaged By The Defamation, Not Just The Denial Of Coverage

 The insurance company does not challenge the sufficiency of the evidence that its statement "the loss resulted from an intentional act committed by you or at

your direction" was false and that the insurance company wrote that statement either with knowledge that it was false, or with reckless disregard for whether it was true or false at a time when the insurance company had serious doubt as to whether it was true. The insurance company does not challenge the sufficiency of the evidence showing that it wrote the statement and that the statement was read by other insurance agents employed by other companies. Additionally, the insurance company admitted that its statement tended to deprive Overcast of the benefit of insurance contracts in the future and that its statement damaged Overcast's reputation. The company, however, seems to argue that the denial of coverage, not the defamatory statement, caused Overcast's damages. The question of whether Overcast's damages were caused by the defamatory statement was for the jury to decide. There was ample evidence to support its verdict.

### (c) The Communication Was Not Privileged

■■■ While there is statutory immunity for statements made by insurance companies in canceling policies, there is no similar protection for statements made in denying claims. Section 375.006 deals in part with an insurance company's liability for statements made to an insured in cancellation notices, though this statute does not protect mutual insurance companies, such as Billings Mutual. While offering immunity to insurance companies against libel and slander in cancellation notices, through section 375.007, the statute also prohibits those insurance companies from inquiring about any prior cancellation of an applicant. Thus, in cancellation situations the statute protects both the insurance companies against defamation and their insureds' reputations and ability to obtain insurance in the future. Where, as here, the general assembly has not chosen to establish an immunity, this Court will not create an absolute privilege for such communications.

■■■ The insurance company argues that without an absolute privilege the insurance company's hands are tied because it must inform its insureds as to the reasons for denial of claims. However, the insurance company does not direct this Court to any case law, statute, or provision in the policy creating a duty to send a denial letter without even a request by the insured.[7] Furthermore, an insured who decides to bring a defamation claim will still have to prove all of the elements of defamation, including falsity and malice. Thus, an insurance company will not be liable for defamation if it sends its denial letters with stated reasons after a fair and thorough investigation that develops substantial evidence to support its decision.

### (d) Overcast Did Not Consent to Defamation

■■■ The insurance company argues that Overcast consented to the letter and the defamatory statement. Consent is one of a few privileges that protect a speaker from liability for making a defamatory statement. *Williams v. School District of Springfield R–12*, 447 S.W.2d 256 (Mo. 1969). One who has invited the publication of defamatory statements cannot be heard to complain of the resulting damage to his reputation. *Id.*

Billings Mutual's reliance on *Williams, supra*, and *Turner v. Gateway Transportation Company*, 569 S.W.2d 358 (Mo.App. 1978), is misplaced. In *Williams*, a teach-

---

7. Billings Mutual cites *Bennett v. National Fire Insurance Company of Hartford*, 235 Mo. App. 720, 143 S.W.2d 479 (Mo.App.1940) and *Reed v. Prudential Insurance Company*, 229 Mo.App. 90, 73 S.W.2d 1027 (Mo.App.1934), to conclude it was obligated to send a letter. In those vexatious refusal to pay cases, the facts and circumstances are distinguishable.

The Court does not mean to say that reasons for denying a claim should not be given. In fact, if only for good customer relations, insurance companies would state a reason for denying a claim. However, where a reason is given, the basis for denying a claim must ultimately be valid and supported by the insurance company's investigation. This, the

er appeared at a public school board meeting and asked the board "why she was not going to be reemployed." 447 S.W.2d at 268. This Court held that, by her specific question, the teacher had consented to the publication of the reasons at the meeting. *Id.* In *Turner,* the publication occurred when a discharge letter was sent by the employer to a third party. However, the union contract in *Turner* specifically required the letter to be sent to this third party. Thus, the consent in *Turner* was contained in the union contract to which the employee was bound. In these cases, the plaintiff either requested that the specific information be published in the presence of the third parties or had agreed by contract to the publication of the specific information to third parties. *See Willman v. Dooner,* 770 S.W.2d 275 (Mo.App.1989); *Johnson v. City of Buckner,* 610 S.W.2d 406 (Mo.App.1980); *Westbrook v. Mack,* 575 S.W.2d 921 (Mo.App.1978); *Hellesen v. Knaus Truck Lines, Inc.,* 370 S.W.2d 341 (Mo.1963). Here, there was no evidence that Overcast specifically requested the reasons,[8] and the insurance company admitted that its policy does not provide for a letter to be sent stating the reasons.

There was no evidence that Overcast consented to being defamed, and no legal basis for such a defense.

### (e) The Jury Instructions Were Proper

■ Billings Mutual does not challenge the MAI-based instructions given by the trial court, but asserts that three proposed additional instructions should have been submitted to the jury. The insurance company proposed instructions on a legal defense of "belief and opinion privilege," an instruction concerning whether the communication was protected by the consent privilege, and one concerning whether the defendant believed the statements in the letter to be true.[9] As to the "privilege" instructions (B and E quoted in the footnote) the determination of whether the defense of absolute or qualified privilege exists is a question for the court and not the jury. *Wright v. Over–the–Road, City Transfer Drivers, Helpers, Dockmen, Warehousemen,* 945 S.W.2d 481 (Mo.App. 1997), (citing *Hellesen,* 370 S.W.2d 341, 345 (Mo.1963)), *Estes v. Lawton–Byrne–Bruner Ins. Agency Co.,* 437 S.W.2d 685, 691 (Mo.App.1969). The insurance company failed to persuade the trial court that its defamatory statement was privileged and was attempting to submit the same question to the jury. The trial court's rejection of privilege was correct, as noted above. It was proper for the trial court to refuse to submit the jury instructions.

■ It also was proper for the trial judge to refuse to submit instruction F to the jury. The insurance company's reliance on *Pape v. Reither,* 918 S.W.2d 376 (Mo.App.1996), and *Henry v. Halli-*

jury obviously concluded, was not the case here.

8. Overcast did make a statement during his Examination under Oath that he wanted to know where he stood in regard to the claim. However, in *Williams,* this Court stated "when no previous publication has been made, the publication is, as a general rule, privileged if the fact appears that the particular publication under consideration was *procured* or *invited* by plaintiff or his authorized agent, *and if the answer of defendant does not go beyond plaintiff's question....*" 447 S.W.2d at 269 (emphasis in original and added). At the time of the Examination under Oath, Overcast was not aware of the insurance company's decision to deny the claim. Overcast's statement was not an invitation or consent, but even if it were to be so con-

strued, the letter exceeded Overcast's question of where he "stood."

9. Proposed Instruction B read: "Your verdict must be for defendant on plaintiff's claim of defamation if you believe the statements contained in the denial letter set forth defendant's belief and opinions as to the cause of the fire."
Proposed Instruction E read: "Your verdict must be for defendant on plaintiff's claim of defamation if you believe plaintiff, in connection with the submitted insurance claim, invited or consented to written notification of defendant's decision upon the insurance claim."
Proposed Instruction F read: "Your verdict must be for defendant on plaintiff's claim of defamation if you believe that the statements as contained in defendant's denial letter were true or believed by defendant to be true at the time the letter was sent."

*burton,* 690 S.W.2d 775 (Mo. banc 1985), is misplaced. *See Nazeri, supra,* 860 S.W.2d 303, and *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). The Supreme Court of the United States has rejected the notion that there is "a wholesale defamation exemption for anything that might be labeled 'opinion'," [as] "expressions of 'opinion' may often imply an assertion of objective fact." *Nazeri,* 860 S.W.2d 303, (citing *Milkovich,* 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1.) The test to be applied to an ostensible "opinion" is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact. *Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695; *see also Benner v. Johnson Controls, Inc.,* 813 S.W.2d 16, 20 (Mo. App.1991). The issue of falsity relates to the defamatory facts implied by a statement—in other words, whether the underlying statement about the plaintiff is demonstrably false. Whether the speaker himself subjectively believed the statement is ordinarily not a factor in establishing the defamatory character of the statement, although the speaker's belief may be relevant to the issue of malice. *Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695.

As submitted, the insurance company's proposed instructions did not properly state the law. There was no error in refusing the instructions.

### Conclusion

Overcast's tort claim for defamation was not preempted by statute. The claim was correctly submitted to the jury and supported by the evidence. There is no contention that the jury's verdict for actual and punitive damages is excessive.

The judgment of the trial court is affirmed.

All concur.